### In re C. J. McDONALD & SONS.

(District Court, D. South Carolina. March 14, 1910.)

1. BANKRUPTCY (§ 165*)—PREFERENCES—MORTGAGES.

Whether a mortgage executed by a bankrupt and assigned to a bank constituted an invalid preference must be determined by its effect, and not by its form, under the rule that the court looks at results, and not at the ways by which they are accomplished.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 165.*]

2. BANKRUPTCY (§ 166*)—PREFERENCES—NOTICE OF INSOLVENCY.

A creditor of a bankrupt receiving security under circumstances indicating that his debtor is insolvent is required to exercise ordinary prudence to ascertain such fact; and, if he fails to investigate, he is chargeable on an issue as to whether such security constitutes a preference with all the knowledge which it is reasonable to suppose he would have acquired if he had made inquiry.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 255, 256; Dec. Dig. § 166.*]

3. BANKRUPTCY (§ 166*)—PREFERENCES—KNOWLEDGE OF INSOLVENCY—SECURITY.

A bankrupt, while insolvent and largely indebted to a bank, desired to purchase the stock of G., who was also indebted to the bank in September, 1908, but was not permitted by the bank to do so except on securing the bank's claim. This was accomplished by the bankrupt's executing a chattel mortgage to G. on both the stock so purchased and the bankrupt's original stock, which G. transferred to the bank to be held as security for the bank's entire debt. The bankrupts at this time were not only insolvent, but were being pressed for payment, and had largely misrepresented their assets and credit rating had been withdrawn. On October 27th following they filed a voluntary bankruptcy petition. *Held* that, in the absence of evidence on behalf of the bank that its officers had no knowledge of the bankrupts' insolvency, it would be presumed that they had such knowledge, and that the mortgage was invalid as a preference.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 250-258; Dec. Dig. § 166.*]

In Bankruptcy. In the matter of bankruptcy proceedings against C. J. McDonald & Sons. On petition to review a referee's order establishing the validity of a mortgage to B. R. Gasque, in so far as it attempted to secure the claim of the Bank of Marion. Reversed.

B. A. Hagood, for Bank of Marion.
Montgomery & Lide and J. W. Johnson, for creditors.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

BRAWLEY, District Judge. The referee has filed an able and elaborate report reviewing with careful discrimination the numerous decisions on the questions involved, and, if his view of the facts is correct, his conclusions are irresistible; but my mind, very reluctantly, refuses assent to his conclusions, and it is my duty to decide the case in accordance with my own judgment and conscience. The rule is upon an appeal from a referee to accept his conclusions on questions of fact, unless the same are manifestly erroneous, and that is because he hears the testimony, can note the demeanor of witnesses, and is in a better position to determine the weight of the spoken words. If there was any conflict in the testimony, any question the determination of which was affected by the credibility of witnesses, I would refuse to disturb his conclusion. Such is not the case here, for there is no conflict in the testimony, and the case turns upon the inferences to be drawn from the proved or admitted facts, and I can no more escape drawing my own inferences than from the performance of any other judicial duty.

McDonald and his sons lived until a few years ago on a small farm, containing something over 100 acres, near the town of Marion. The title to this farm was in his wife. In the autumn of 1905, they commenced business in the town on a capital of $700, which was advanced by the father, who shortly afterwards put in $300 of money which he said be obtained from his wife in payment for the live stock on the farm. The business commenced in September, 1905. E. B. McDonald, the son, seems to have been the chief manager of it. They began borrowing money from the Bank of Marion shortly after they commenced business. The exact amount then borrowed is not stated, but it appears that they borrowed from time to time, giving chattel mortgages on their stock of merchandise as security. So far as appears from the testimony, the only money ever paid on these loans was $250, some time in 1906. In the autumn of 1908 they were indebted to the bank on two notes, one for $1,411, dated October 18, 1907, the other for $1,725, dated January 15, 1908, and pledged their entire stock of merchandise and all accretions thereto as security. These notes, which were in the nature of chattel mortgages and have been so denominated by the referee, were not recorded. The referee considers the fact that the Bank of Marion did not record these chattel mortgages as evidence that the firm was in good credit. Another inference might be drawn from this circumstance, and that is that, having begun in the autumn of 1905 to make advances, the amount of indebtedness had so increased at the time these notes were given that the putting of the mortgages on record would destroy their credit, and thus render improbable the collection of the debt. In the summer of 1908 the creditors of McDonald & Sons began to press them for payment, and in the autumn some of them commenced suit. In July of that year Bradstreet & Co. withdrew their rating. There is no testimony that the Bank of Marion had knowledge of this action on the part of Bradstreet, but, inasmuch as the referee lays great stress upon, and repeatedly refers to, the good faith of the transaction hereinafter to be considered, it may be as well to say, as throwing light

upon the character of the McDonalds, that in their statements to merchants for the purpose of obtaining credit they had in February, 1907, claimed to be the owners of real estate to the value of $10,000, and in February, 1908, they made a statement to Roberts and Hoge of Richmond, Va., that they owned real estate of the value of $15,000, and that they had surplus assets over and above their total liabilities of $24,200, the truth being that they had no real estate whatever, the small farm on which they had lived having years before been transferred to the wife of C. J. McDonald. In July, 1908, they obtained from creditors who were pressing them extension of the time of payment, and during that year they had several special sales for the purpose of raising money, which they say they applied to the payment of their debts, as far as they could. In the autumn of 1908, with the view of getting a larger storehouse, they began negotiations with B. R. Gasque, and on September 9th bought out Gasque's stock of merchandise at 85 per cent. of its value, giving a mortgage upon the Gasque's stock and upon their own stock of merchandise to secure the payment. Gasque, it seems, was indebted also to the Bank of Marion, and consulted Mr. Mullins, president of the bank, with regard to the transaction, and Mr. Mullins was unwilling to consent to it, unless the debt of the McDonalds to the bank was secured. This condition was complied with. The mortgage was executed and assigned to the Bank of Marion. The McDonalds filed their voluntary petition in bankruptcy October 27, 1908. The stock of merchandise covered by the mortgage, which included both the Gasque stock and the McDonald stock, was sold by the trustee after due advertisement, and bought in by the Bank of Marion for $12,843.90, which was the amount due upon the bank's mortgage, together with the estimated costs of the bankruptcy proceedings, a payment of something over $2,000 having been made to the bank in October. The amount due by the McDonalds to the bank on September 9, 1908, was $3,737.22. The bankrupts had no other assets than the stock of merchandise described in the mortgage. The unsecured indebtedness of the bankrupts is $17,354.46, being principally for merchandise purchased in 1907 and 1908, most of it in 1908.

If the referee's judgment is affirmed, the Bank of Marion will be paid in full. The other creditors will receive nothing. The mortgage to Gasque to secure payment of the stock of goods sold at the time being for a present, fair consideration, is by the terms of the bankruptcy act (Act July 1, 1898, c. 541, 30 Stat. 544 [U. S. Comp. St. 1901, p. 3418]) unassailable, but, in so far as the mortgage was intended to secure to the Bank of Marion payment of indebtedness incurred long before, it stands upon a different footing. If it had been given directly to the bank less than two months before the voluntary petition in bankruptcy, he would be a bold person who would attempt to sustain it. Every creditor who attempts to secure himself in such circumstances must know that he takes a title liable to be assailed; that the design of the bankruptcy act is to secure equality among creditors, and every transaction within the four months anterior to bankruptcy is open to investigation. By the terms of the act a person "shall be deemed to have given a preference if, being insolvent, he has

within four months before the filing of the petition * * * made a transfer of any of his property, and the effect of the transfer will be to enable any one of his creditors to obtain a greater percentage of his debt than any other of such creditors of the same class, and if a bankrupt shall have given a preference and the person receiving it, or to be benefited thereby, shall have had reasonable cause to believe that it was intended thereby to give a preference, it shall be void," etc. That there was a preference in fact cannot be gainsaid. The Bank of Marion secures its whole debt. The other creditors get nothing, not even enough to reimburse them for the postage on the mailing of their claims. That the bankrupts were insolvent at the time the mortgage was given is not disputed. The inevitable effect of the transfer being to give the bank a preference, it must be conclusively presumed that it was intended.

The only question, then, is whether the bank had reasonable cause to believe that it was intended. It can make no difference that the mortgage was given to Gasque, and by him transferred to the bank. The effect was to prefer the bank, and the transaction must be determined by its effect, and not by its form. The court must look at results, and not at the devious ways by which they are accomplished. It is not every transaction or transfer of property within the four months period, the effect of which is to give a preference, that is void. I so held in Tindal's Case, 155 Fed. 456, cited by the referee. In that case Harby, one of the preferred creditors, lived in another county. He testified that he did not believe that the bankrupt was insolvent, and had no ground for believing that the mortgage was intended as a preference. The referee found as a fact that the creditor had no knowledge of the real pecuniary condition of the bankrupt, nor reasonable ground to believe that the mortgage was intended as a preference, and, after a careful consideration of the testimony, I concurred in this finding, and so as to the other mortgage, which was sustained, the mortgagee living in a different county, and there being no testimony that she was acquainted with the bankrupt's actual condition. One of the mortgages was set aside because under the proofs the creditor had reasonable cause to believe that the preference was intended. The president of the Bank of Marion is a lawyer. There is a strong presumption that lawyers and bank presidents in a town of that size are tolerably well acquainted with the pecuniary condition of merchants and others with whom they are doing business. The bank must have known that the McDonalds started business on a very small capital. They were small farmers in the neighborhood of the town, and the bank began making advances to them in the autumn of the year 1905, when they began business. It must have known that they had no real estate, and, although there is nothing to impute knowledge to the bank that the McDonalds in order to obtain credit outside the state were making false representations that they owned $15,000 of real estate, yet the fact that they had little capital must certainly have been known to it. Its own debt was not reduced by payments. On the contrary, it was increasing. In January, 1908, as appears from the notes, it amounted

to $3,136. In September, when the mortgage was given, the amount due was $3,737.22. This is a large sum for people like the McDonalds. The testimony is that the McDonalds were. pressed by their creditors in the summer of 1908, and that they secured extensions from their creditors. It does not appear that any suits were actually brought until some time in September, after the date of the mortgage, but before it was put on record, but it is scarcely to be believed that a bank president and a lawyer, in a town the size of Marion, should not have had some information that the McDonalds were in a straightened condition. It is not unlikely that accounts falling due were sent to the banks for collection, for such is the custom of business. There is no testimony on the part of the bank that it did not know, or that it did not have reason to know, what was the actual condition of the McDonalds, and it seems to me that the circumstances all show that Mr. Mullins, the president of the bank, traveled as near to the edge of actual knowledge as it would be possible for him to go without obtaining it. While the transaction with Gasque was somewhat unusual, there is not enough to impeach it, although the results proved unfavorable to the creditors generally. It appears that he, too, was indebted to the bank; that he bought his stock of goods a few years before, when he began business. from Mr. Mullins, and it appears that he is solvent, but that Mr. Mullins as president of the bank was unwilling that he should make the deal with the McDonalds, without providing for the payment of McDonalds' indebtedness to the bank. The learned referee says:

"While the situation in which the bank finds itself might be peculiar, yet there is a total failure of any testimony impeaching the good faith of this transaction. On the other hand, the testimony firmly establishes the entire good faith of the transaction."

It is fair to assume that the referee means by this language that the purchase of Gasque's stock and that the mortgage to secure it was in good faith. That may well be. He surely cannot mean that "the testimony affirmatively establishes the entire good faith of the transaction," in so far as it affects the preference to the bank, for there is an entire absence of testimony tending to establish that point. There is no evidence of "good faith" in so far as the general creditors are concerned. On the contrary, abundant and uncontradicted evidence that the bankrupts obtained credit outside of the state by false representations of their condition; that as late as February, 1908, they claimed to be owners of $15,000 of real estate, when they had no real estate whatever: that they claimed that their total indebtedness was only $3,500, when their indebtedness to the bank alone was over $3,100; that they had a surplus of assets over all liabilities of more than $21,000. On September 9th all of their property is conveyed in such a way as to secure payment in full to one favored creditor, and 48 days thereafter they filed their petition in bankruptcy. This bald statement of undisputed facts shows utter lack of "good faith," unless the preferring of a favored creditor is in itself evidence of good faith. Discussion to show that the effect of this mortgage was to give the bank a preference over all the creditors of the

bankrupts is unnecessary. That the mortgagor was insolvent at the time stands confessed. That this transaction was a fraud upon all the other creditors is self-evident, but under the law the transaction must stand, and the party benefited thereby may hold his preference, unless he had reasonable cause to believe that the mortgagor was insolvent at the time the preference was given.

Actual knowledge is not made the criterion of proof in such cases, nor is it necessary that it should appear that the bank actually believed that the mortgagor was insolvent, but the true inquiry is whether Mr. Mullins, as president of the bank, a lawyer, and business man of ordinary prudence, sagacity, and discretion, had reasonable cause to believe that the debtor was insolvent, in view of all the facts and circumstances, and, as it appears that the debtor was in fact insolvent, it seems to me clear that the circumstances were such as would put a person of ordinary prudence and discretion upon inquiry, and that it was his duty to make all such reasonable inquiry, and that there were such means of knowledge as would have enabled him to ascertain the true state of the case. A creditor, under these circumstances, is required to exercise ordinary prudence, and, if they failed to investigate, they are chargeable with all the knowledge which it is reasonable to suppose they would have acquired if they had performed their duty in that regard. Positive proof of collusion between debtor and creditor, by which one may be preferred, is not generally to be expected, and for that reason, among others, the law allows a resort to circumstances as the means of ascertaining the truth, and the rule of evidence is well settled that circumstances inconclusive if separately considered may by their joint operation, especially when corroborated by moral coincidences, be sufficient. Signs of insolvency were too many and too marked not to warn the president of this bank that he was getting a prohibited advantage over other creditors. The facts are so persuasive that they would have given reasonable ground for suspicion to persons far less astute and less accustomed to the ways of business in general than was the president of this bank. The unusual nature of the transaction, in connection with all the circumstances, raises such a presumption that it can only be overcome by proof on the part of the preferred creditor that he took the proper steps to find out the pecuniary condition of the debtor. Mr. Mullins has not testified in the case, nor has any one in behalf of the bank testified as to its knowledge of the pecuniary condition of the bankrupts, or that they made any inquiries concerning it.

In Merchants' National Bank v. Cook, 95 U. S. 346, 24 L. Ed. 412, the court says:

"When the condition of a debtor's affairs are known to be such that prudent business men would conclude that he could not meet his obligations as they matured, in the ordinary course of business, there is reasonable cause to believe him to be insolvent. Knowledge is not necessary, nor even a belief, but simply reasonable cause to believe."

In Toof v. Martin, 13 Wall. 48, 20 L. Ed. 481:

"Making a transfer of property to these creditors under these circumstances was in fact giving them a preference, and it must be presumed that the bankrupt intended this result at the time. It is a general principle that every one

must be presumed to intend the consequences of his act. The transfer in any case of a large portion of his property while he is insolvent to one creditor, without making provision for an equal distribution of its proceeds to all his creditors, necessarily operates as a preference to him, and must be taken as conclusive that a preference was intended, and, unless the debtor can show that he was at the time ignorant of his insolvency and that his affairs were such that he could reasonably expect to pay all his debts, the burden of proof is upon him in such case, and not upon the assignee or contestant in bankruptcy."

These cases arose under Act March 2, 1867, c. 176, 14 Stat. 517, where insolvency consisted in inability to meet claims as they matured; while under the act of 1898 a much broader test is prescribed. Under the act of 1867, that which a creditor might be said to have reasonable cause to believe was insolvency, which, as stated, was inability to meet claims as they matured, under this statute it is the intent to give a preference, but this difference in the statutory language does not affect the judicial interpretation of the phrase "reasonable cause to believe." Cases under that law are therefore still applicable. In a case of this kind, one cannot state with absolute certainty what the law is. He can only give his opinion, and opinions naturally may differ. Facts which appear to one mind entirely sufficient to justify a certain inference may to another equally desirous of ascertaining the truth present quite another aspect. The referee says in his report, "The fact that every individual member of the partnership was insolvent on October 27, 1908, is not conclusive evidence that such was the case on September 9, 1908, or on October 1, 1908," and in support of this view cites Tumlin v. Bryan, 165 Fed. 166, 91 C. C. A. 200, 21 L. R. A. (N. S.) 960. That was a suit by a trustee in bankruptcy to recover the amount of six payments made by the bankrupts within four months of bankruptcy, the first of which was made July 26, 1906. An involuntary petition was filed against the firm October 5, 1906. The schedules of the bankrupt firm were filed December 27, 1906. The court held that these schedules filed in December were insufficient to show insolvency in July, and says:

"It is not shown what property was owned by the firm in July, 1906, at the date of the payments, nor is the value of the property then owned by it proved, and, besides, we find no evidence showing what property was owned by the individual members of the bankrupt firm in July, 1906."

Further on in its opinion the court says, "If the members of the firm are solvent, the creditors may be paid in full," and again, "the reasonable implication of the statute, it has been held, is that the debtor himself must have intended preference," and "a careful reading of the evidence does not lead us to the conclusion that the defendant believed the firm to be insolvent." I do not regard this case as of much authority. All of the evidence does not appear in the opinion, and so far as it does appear the facts are different, nor do I agree with the statement of law that the debtor himself must have intended the preference in order to make it void, holding that the better rule is that, if the effect of the act was to create a preference and that was its natural consequence, the debtor must be presumed to have intended to do that which was the natural and reasonable tendency

of the act done. Another case relied on by the referee is Butler Paper Co. v. Goembel, 143 Fed. 295, 74 C. C. A. 433. The main point in that case was whether the aggregate value of the bankrupt's property at the date of the mortgage was at a fair valuation sufficient in amount to pay his debts. There was conflicting testimony, and the referee found that it was, and the court held that the testimony to the contrary furnished no reasonable ground for overruling the referee's conclusion, and, assuming that to be correct, the court held that there was no testimony sufficient to overrule the finding of the referee that the appellants were without reasonable cause to believe that an unlawful preference was intended; that conclusion being well supported by the testimony.

Coder v. Arts, 213 U. S. 223, 29 Sup. Ct. 436, 53 L. Ed. 772, cited by the referee, is not helpful on the point involved here, as the Supreme Court passed only upon the questions of law; the questions of fact having been decided by the District Court and affirmed by the Court of Appeals. The conveyances in that case were impeached under section 67e of the bankruptcy act, and, although the attorneys for the creditors have in this case claimed that this mortgage is void under section 67e of the bankruptcy act, and also under section 2648 of the Code of Laws of South Carolina, as being an assignment with a view to giving an unlawful preference, I have not considered those grounds of objection. There are three elements in a preference under the bankruptcy act: (1) A transfer of property by the bankrupt; (2) a consequent inequality between creditors of the same class; (3) insolvency. All of these elements are found in this case. There is not a doubt, or room for a doubt, that the bankrupts were insolvent when they executed the mortgage of September 9th. There is not a doubt that this mortgage of substantially all their property was a transfer within the meaning of the bankruptcy act, and the resultant inequality is beyond question. The Bank of Marion will receive payment in full of its debt incurred long before, and subsequent creditors will receive nothing. The intent to prefer is not required to be specifically proved. It is conclusively presumed if the effect is to give one creditor a greater percentage of his debt than other creditors of the same class, but inasmuch as business would be seriously interfered with if every payment made upon the eve of bankruptcy should be set aside upon light or trivial grounds, the law makes these preferences voidable only when the party receiving them or to be benefited thereby has reasonable ground to believe that a preference was intended. Where the bankrupt conveys his entire estate, and one creditor alone is benefited thereby, there is a strong presumption of an unlawful preference, and when, as in this case, insolvency is admitted by the filing of the voluntary petition of the debtor within less than 50 days from the date of the transfer, and the proof is that for some months prior thereto they had been pressed by creditors and had secured extensions, that the creditor was a bank, which in a town like Marion had unusual opportunities of finding out the true condition of the debtor, that it had claims against it of long standing, there arises such a strong presumption that the creditor had such reason-

able cause to believe that the debtor was in such financial condition as was actually proved in less than two months, the court must conclude that the circumstances were such as to put upon the creditor the duty of inquiry, and where the creditor, as here, fails entirely to offer any testimony to rebut the strong presumptions against it which necessarily arise, when it is in its power to say, if it was the truth, that it had no knowledge of the debtor's actual financial condition, that it had no reasonable cause to believe that its debtor was insolvent, if such were the truth, it strengthens the presumption, and leads to the conclusion that this was an unlawful preference and must be set aside; and it is so ordered.