## In re KLEIN.

### DOUGHERTY v. FIRST NAT. BANK OF CANTON, OHIO.

(Circuit Court of Appeals, Sixth Circuit. June 26, 1912.)

No. 2,134.

**1.** BANKRUPTCY (§ 160*)—PREFERENCE—INSOLVENCY.

In determining the question of the solvency of a bankrupt, who conducted and owned the furniture in a hotel, at the time he executed a mortgage to a creditor claimed to be preferential, his property must be valued as that of a going concern, and not at what it was worth as dead property after bankruptcy had intervened.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 249–258; Dec. Dig. § 160.*]

**2.** BANKRUPTCY (§ 166*)—PREFERENCE—KNOWLEDGE OF CREDITOR.

Bankrupt, who was an experienced hotel keeper, leased a large hotel. and invested several thousand dollars of his own money in furnishing the same together with $10,000, borrowed from a bank. He afterward applied for an additional loan of $5,000, to pay other bills, which was made in consequence of an examination of his books and hotel equipment by the cashier, who represented the bank in the transaction, which examination tended to support his claim as to the amount of his investment, and on his statement that the business was profitable, and would pay all of his debts in time. The bank then took a mortgage on the hotel furnishings, which constituted the greater part of the bankrupt's property, to secure both loans. *Held*, that such facts were not sufficient to charge the bank with reasonable cause to believe that the bankrupt was insolvent so as to render the mortgage voidable as a preference under Bankr. Act July 1, 1898, c. 541, § 60b, 30 Stat. 562 (U. S. Comp. St. 1901. p. 3447), as amended by Act Feb. 5, 1903, c. 487, § 13, 32 Stat. 799 (U. S. Comp. St. Supp. 1911, p. 1506).

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 250–258; Dec. Dig. § 166.*]

**3.** BANKRUPTCY (§ 161*)—PREFERENCE—DELAY IN RECORDING CHATTEL MORTGAGE.

A chattel mortgage given when the mortgagor was solvent to secure an antecedent debt, but not recorded until after he became insolvent and within four months prior to his bankruptcy, does not constitute a preference under Bankr. Act July 1, 1898, c. 541, § 60a, 30 Stat. 562 (U. S. Comp. St. 1901, p. 3447), as amended by Act Feb. 5, 1903, c. 487, § 13, 32 Stat. 799 (U. S. Comp. St. Supp. 1911, p. 1506), where the withholding from record was not with any fraudulent intent nor with knowledge of the mortgagor's insolvency, and under the law of the state the failure to record rendered it void only as to subsequent purchasers without notice and lien creditors, and did not affect its validity as between the parties or as to general creditors. In such case it takes effect as of the date of its execution, and is to be judged as of that time in determining its, voidable character.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 261–263; Dec. Dig. § 161.*]

Appeal from and Petition to Review an Order of the District Court of the United States for the Northern District of Ohio.

In the matter of J. Alfred Klein, bankrupt. Appeal and petition for review by C. A. Dougherty, trustee, to review an order of the Dis-

trict Court sustaining a chattel mortgage in favor of the First National Bank, of Canton, Ohio.    Affirmed.

The trustee in bankruptcy brings this case here by both appeal and petition to review.

In March, 1905, the bankrupt, Klein, an experienced hotel keeper. leased a large hotel at Canton, Ohio, for $8,200 for the first year and an increased rental thereafter of $1,200 per year until the maximum of $13,000 was reached. After equipping it anew in an elaborate manner, he opened it for business on October 17th. In his evidence he fixed his investment at about $50,000. Its exact amount is uncertain, but, not including certain necessary expenditures incident to fitting and opening the hotel, he expended $20,500 of his own funds, and $10,000 borrowed of the First National Bank, of Canton, with which he did his banking business. On December 14th he borrowed on the note of himself and his father-in-law, Clayson, $6,000, for which the latter pledged certain bank stock. Klein's evidence tends to show that this sum was used in connection with the hotel. In October, 1906, he represented to Loichot, the bank's cashier, as he did on different occasions to others, his investment to be between $60,000 and $65,000, and his entire indebtedness between $35,000 and $36,000—being $10,000 due the bank, about $11,000 (including the $6,000 above mentioned) to Clayson, about $4,000 to the William Edwards Company, his principal merchandise creditor, and, including certain unpaid rent about which there was a dispute, about $10,000 to various small creditors, and requested an additional $5,000 loan, to be applied on such last-named debts, the residue of which he proposed to pay out of the profits of his business, which he fixed at about $1,000 per month. Having submitted a list of his assets and liabilities, Loichot personally inspected his books and the hotel equipment, with which he had some acquaintance and by whose elegance he was impressed, and checked up not only the greater part of the listed liabilities, which were found to be correct, but also the invoices and bills of cost, which, in so far as submitted, aggregated a sum between $40,-000 and $45,000. The bank suggested that it furnish $3,000 and Clayson $2,000 of the desired loan, but the latter, not being in funds, an agreement was made that the bank should loan the $5,000, a note for $2,000 of which should be indorsed by Clayson, and that Klein should give the bank a chattel mortgage on his hotel belongings to secure both the original $10,000 and the new $5,000 loan, and a second mortgage on the same property to Clayson and the William Edwards Company, which, through a representative and attorney, was asking for security, to secure the former's claim of $11,708 and the latter's of $4,184.95. The mortgages were executed and delivered on October 29th, $1,500 of the new loan being applied in the payment of two of Klein's notes—one made to a third party and discounted by the bank, and another left at the bank for collection. After delivery of the mortgages, Klein requested that they be not then filed, because he was negotiating the sale of his property, and feared that their filing would reduce the price otherwise obtainable. The only reason assigned at any time for selling was insufficiency of capital for his business. If he sold, he proposed to liquidate all his debts. It was thereupon agreed between him and his mortgagees that Loichot should take possession of and withhold both mortgages from the files, so long as he saw fit, pending negotiations for the sale of the property, and that, when he filed the bank's he should also thereafter file the other. Negotiations for a sale continued with various parties almost to the time Klein went into bankruptcy. Loichot's making of the loan and withholding of the mortgages from the files had the approval of Lynch, a lawyer and a director of the bank, whose advice was sought, however, in the capacity of a director only. Loichot believed Klein's statements regarding his liabilities, profits, and cost and value of his property to be true, and that Klein had a large equity in the property mortgaged over and above his liabilities. He did not know that Klein was insolvent or unable to pay his debts, or that they would not be paid in full on account of the bank obtaining the mortgage. Klein reported to Loichot on different occasions his negotiations for the sale of the property, at prices ranging from $50,000 to $60,-

000, but in October or November, 1907, Loichot learned of an offer of it for $40,000. Klein on different occasions also made statements to Loichot as to his business, which showed for some months a loss, and for others a profit varying from $500 to $1,500 per month. He reported that he was paying off his unsecured creditors out of the hotel earnings, and in the fall of 1907, that his patronage was increasing and his business doing well, which Loichot's observations in August and September tended to confirm. Klein paid the interest on the bank's mortgage, but no part of the principal. In September of that year, a representative of Klein's landlord informed Loichot that Klein was behind in his rent, but did not say how much, or when he became so, or that the arrearage was other or greater than that which existed when the mortgages were given, and says that he and Loichot discussed the advisability of inducing Klein to sell out at a reasonable and fair price and agreed to co-operate in that direction, but no price was named. Excepting his unpaid rent, Klein paid his unsecured debts contracted prior to the execution of the mortgages. Subsequent thereto and prior to their filing he incurred other liabilities for merchandise, rent, etc., in an amount somewhat difficult to determine, but approximately from $12,000 to $14,000. We assume that his debts for labor and otherwise entitled to priority (including $384 for taxes), amounting to about $2,604, in the absence of dates of their incurring, and from their character and (save one) their smallness, arose after the filing of the mortgages. Within such subsequent period he also incurred merchandise and other debts of several thousand dollars. On October 17, 1907, feeling that Klein had had sufficient time to make some substantial payment on his indebtedness to the bank and that there was no immediate prospect of his reducing it, Loichot, who had not conversed with Klein about his affairs for about a month, of his own accord filed the bank's mortgage and then that of Clayson and the William Edwards Company. Klein had told him on different occasions after the mortgages were given, that he was making money, had been paying off his old debts and would soon be in readiness to pay the bank, and at one time, in the spring of 1907, stated that the hotel was doing so much better that he did not think he would sell, as he did not see how he could get a better investment. Loichot did not know or believe at the time the mortgages were filed that Klein was insolvent, or believe him unable to pay his debts in full. He did not withhold the mortgages from the files to conceal them from Klein's existing or future creditors or to enable him to get credit; nor did he know that Klein, who had promised to take care of new expenditures, had incurred new debts. None of Klein's unsecured creditors knew of the existence of the mortgages until they were filed. On January 24, 1908, an involuntary petition in bankruptcy was filed against Klein, who was adjudged a bankrupt on February 14th. According to his schedules, his debts were $57,411, and his assets, $34,273. The property, so counsel state, was appraised at $29,210, and sold for $18,-000. It is asserted by the bank's counsel that the allowed claims are only about $50,000, but their amount is not disclosed by the record. The referee found that Klein's debts at the time the mortgages were given were about $35,000, but according to his figures, his finding should have been about $33,792. He held both mortgages void as against creditors, but allowed the sums secured thereby as valid unsecured debts, excepting that Clayson's claim was reduced $2,100. The bank, but not the second mortgagees, prosecuted a petition for review to the District Court, which reversed the referee, and we are now asked to reverse the District Court.

Harold Remington, of New York City (Clarke & Clarke, on the brief), for appellant.

A. V. Cannon, of Cleveland, Ohio, and Austin Lynch, of Canton, Ohio (Lynch & Day, of Canton, Ohio, on the brief), for appellee.

Before WARRINGTON and KNAPPEN, Circuit Judges, and SATER, District Judge.

SATER, District Judge (after stating the facts as above). The case is here both on appeal and on a petition for review. As no objection is made touching the remedies so chosen to bring the matters in controversy into this court, we need not concern ourselves with any question of remedy or jurisdiction. Re Martin, 193 Fed. 841 (C. C. A. 6).

The trustee in bankruptcy, to maintain his contention that the bank's mortgage is invalid as against him as the representative of the bankrupt's creditors, advances the following propositions:

(1) The chattel mortgage transferred to the bank the whole of Klein's property when he was insolvent and when the bank had reasonable cause to believe that a preference was thereby intended to be given to it, in consequence of which the bank, if the mortgage be upheld, will receive, in the order of priorities prescribed by the bankruptcy statute, a greater percentage of its claim than other creditors of the same class. The mortgage, therefore, constitutes a preference whether the date of the transfer be considered as of the date of the execution or of the filing of the mortgage.

(2) The bank is conclusively estopped from claiming against him under such mortgage, because the mortgage, in pursuance of a concerted plan and positive agreement, was withheld from record for almost a year, on account of which others were disposed to give and did give Klein credit between the date of the execution and of the filing of such instrument.

(3) The bank's mortgage, considered in conjunction with that of Clayson and the William Edwards Company, which was given at the same time, and with its withholding from record in pursuance of an agreement which contemplated the effect such withholding would have on the debtor's financial standing, was taken for the purpose and with the intent of hindering and delaying his other creditors.

These propositions are all controverted by the bank not only as to the conclusions of fact adduced from the evidence, but as to the law applicable to the case. The transactions involved occurred when sections 60a and 60b of the Bankruptcy Act (Act July 1, 1898, c. 541, 30 Stat. 562 [U. S. Comp. St. 1901, p. 3447]), as amended February 5, 1903 (Act Feb. 5, 1903, c. 487, 32 Stat. 799 [U. S. Comp. St. Supp. 1911, p. 1506]), were in force.

[1] Whether the mortgage to the bank constituted a preference or not at the time it was given must be determined by the facts and circumstances then existing. The situation was such as to beget confidence in Klein and in his ability to pay his creditors in full. As the bank was not urging payment of its original $10,000 loan, and as it from the first considered favorably his application for an increased accommodation, it must be presumed that his business relations with it for the preceding year had been satisfactory. There is no suggestion in the record that he had ever been untruthful in his dealings, or had practiced deception, or had done aught to excite distrust. His apparent frankness in submitting for inspection his invoices, bills of cost, and a statement of assets and liabilities was such as to induce reliance on his representations. In the light of subsequent events, it

appears that he magnified his investment and his monthly profits, if, indeed, there were any at all, and overstated his liabilities by $2,100 in favor of his father-in-law, Clayson, but the valuation for the test of solvency or insolvency under the issue made must relate to the conditions affecting the hotel as a going concern when the mortgage was given, and not at its value as dead property after bankruptcy intervened. Butler Paper Co. v. Goembel, 143 Fed. 295, 74 C. C. A. 433 (C. C. A. 7); Loveland, Bank. (4th Ed.) 303.

[2] The trustee, on whom is cast the burden of proof that the mortgage constituted a preference, concedes that the cost of the hotel equipment for which Klein specifically accounted reaches $35,500, but he did not pretend to account for all of it. Although Klein's evidence beyond that amount is uncertain, nevertheless, notwithstanding his valuation of assets as scheduled in the bankruptcy proceeding, considering the aggregate of his expenditures, as evidenced by his cost bills, and of the funds which had been at his disposal for investment in his business, none of which appear to have been otherwise expended, the expense other than for mere furnishings incident to the launching of an enterprise of the magnitude of his hotel venture, we are not prepared to say that his assets did not exceed his liabilities, or that he was insolvent, or that he did not in good faith believe he could pay his debts in full, and have a substantial sum remaining. The record does not disclose the terms on which his liabilities other than for rent and not secured by the mortgages were incurred, but the inference to be drawn is that some of them had matured. There is, however, no suggestion in the evidence that he contemplated a cessation of business, if the additional loan were not granted, nor any fact disclosed that the necessity for an increased loan to meet his obligations was due to any circumstance other than his recent embarking in a new but reported growing and prosperous enterprise in which he had made an investment in excess of what his capital warranted. He had not stopped the payment of any of his paper, nor had any of it gone to protest, nor had he been sued or threatened with suit for any debt, nor were there rumors that he was financially embarrassed, nor were any creditors, save the William Edwards Company, pressing for payment or security. He proposed, it is true, to mortgage the whole of his property and did not intend to pay from the additional loan his arrearage of rent, about which there was a dispute, or the whole of his floating debt, but, if his investment was as much as Loichot, as cashier acting for the bank, found it to be from the submitted partial list of bills of cost, or as Klein represented it to Loichot to be, his equity in the mortgaged property was from two to four times the amount of his remaining unsecured debt, and this he could easily pay, as he agreed to do, out of his earnings, if they were as represented. The trustee seeks to draw an inference prejudicial to Klein and the bank from the withholding of the wife's property from the mortgage, but the argument is without merit. The law did not cast on her the duty of subjecting her property to liability for her husband's debts, and under the facts then known it did not appear that any necessity for her so doing existed.

The property mortgaged, excepting a small amount intended for consumption, was not of the character of a stock of goods, subject to sale and requiring replacement. It was more in the nature of a permanent investment and akin to that of a manufacturing plant, which is replaced only when worn out. Its incumbrance would not.necessarily cause a stoppage of his business. Loichot was not an expert on the value of hotel equipments, and did not cause an appraisement to be made, nor did he conduct an exhaustive examination into Klein's affairs, but he verified his statement as to liabilities, and found it, as submitted, to be correct, and as to assets he examined far enough to learn that Klein's equity in the property was substantial. He thus entitled himself to the benefit of the rule that reasonable cause to believe that a transfer and the effect of its enforcement will operate as a preference does not exist where the creditor examines the debtor's books, which do not reveal insolvency. Loveland, Bank. (4th Ed.) 1006, 1007. It now appears that his finding as to liabilities, but through no fault of his, was excessive to the amount of $2,100. He found the pressure for security from the William Edwards Company, the largest merchandise creditor, so slight that, acting with deliberation and after it had availed itself of the advice of counsel regarding its claim, that company was content to take a second mortgage, defer payment and pro rate, if need be, with Clayson's large claim. Clayson, although not able for want of ready funds to advance a part of the desired new loan, expressed his confidence in Klein's financial strength, not only by his ready acceptance of a second mortgage, but by his indorsement of Klein's note to the bank for a sum equal to what he would have personally loaned, had he been in funds. The presumption is strong that the bank would not have increased its loan had it not felt itself entirely secure in so doing. Loichot, in the performance of his part of the transaction, did what a reasonable and prudent man would ordinarily have done under like circumstances. He believed in the accuracy of Klein's statements as to the extent of his investment, his liabilities and profits, and his personal investigation tended to confirm their truthfulness. But knowledge of or belief in Klein's insolvency is not the criterion of proof. The true inquiry is, Did he have reasonable cause to believe? Merchants' Nat. Bank v. Cook, 95 U. S. 342, 346, 24 L. Ed. 412; Loveland, Bank. (4th Ed.) 911, note; Re McDonald & Son (D. C.) 178 Fed. 487, 492; Collier, Bank. (8th Ed.) 666. In view of the evidence submitted, we are constrained to hold that he did not have such knowledge of facts as would induce in the mind of an ordinarily prudent man reasonable belief that Klein was insolvent, or that the intrinsic value of his assets was not largely in excess of his debts, or that he intended to give the bank a preference by the execution and delivery of the mortgage to it, nor did he accept it for that purpose. Excepting as to the hotel and saloon supplies intended for consumption, the bank's mortgage at his inception and execution was free from infirmity.

We do not attach importance to the nonproduction by the bank of the list of assets and liabilities submitted to it by Klein prior to the execution and delivery of the mortgage. No formal demand was

made for it by the trustee, nor does it appear that such list was left in Loichot's possession, or that any search was made for it by any party to this proceeding. If it remained with Klein, the duty of producing it or of accounting for its absence rested on the trustee rather than on Loichot. The evidence as to its submission and as to what it showed is convincing. There is nothing in the record derogatory to the credibility of Loichot as a witness.

[3] The agreement that the mortgage should be withheld from the files pending negotiations for the sale of the mortgaged property was not in contemplation at or prior to the time of the giving of the mortgages, but had its origin after they had been executed and delivered. That intending purchasers will ordinarily take advantage of a seller's financial burdens, if their existence be known, to minimize the price to be paid for the article offered, is a well-known fact. The purpose of the agreement was meritorious, in that it sought to avoid such a situation and to realize the greatest sum possible for the mortgagor and his creditors, and not to enable him to obtain a fictitious credit or to continue business. Its design was to benefit, and not to injure, creditors. Loichot's information at the time the mortgages were filed was that Klein's financial standing was better than when the mortgages were given, and that no new liability had been incurred, unless the vague statement of the landlord's representative to Loichot is susceptible of the strained construction that the arrearage for rent was other than or in excess of that which existed when the mortgages were given. The landlord knew of Klein's debt to the bank, but Loichot did not communicate to the landlord the existence of the mortgages, nor was he called upon by anything that occurred in such conversation to make any disclosure regarding them. Klein, however, at the time the mortgages were filed, had incurred liabilities largely in excess of those which he had satisfied, to persons ignorant of the existence of the mortgages, and was insolvent, and it is therefore urged that the bank is conclusively estopped from claiming under its mortgage as against the unsecured creditors.

The withholding of the mortgages from record in pursuance of an agreement is a fact to be considered in connection with all the other facts and circumstances in determining whether the transaction was fraudulent or not. It is doubtless true that the failure to file the mortgages gave Klein better credit than he otherwise would have had and enabled him to continue business longer than he otherwise could have done, and yet the average amount of credit per month obtained by him was seemingly as great after they were filed as it was before. This may have been due to his decreased ability to pay. There is, however, no affirmative evidence that any one gave Klein credit in reliance on his apparently unincumbered property, nor did the bank have knowledge of an intent on his part to deal with others as the owner of property of that character. It did not misrepresent its interest in the property, or withhold the mortgage from an actual fraudulent motive, or know or believe that the mortgagor was insolvent. Actual fraud did not exist.

The law of Ohio is controlling upon federal courts in questions arising upon the validity of chattel mortgages given and filed in that state upon property located therein. Re Shirley, 112 Fed. 301, 50 C. C. A. 252; Etheridge v. Sperry, 139 U. S. 266, 11 Sup. Ct. 565, 35. L. Ed. 171. Section 4150, Revised Statutes of Ohio, regulating the filing of chattel mortgages, provides:

"A mortgage, or conveyance, intended to operate as a mortgage of goods and chattels, which is not accompanied by an immediate delivery, and followed by an actual and continued change of possession of the things mortgaged, shall be absolutely void as against the creditors of the mortgagor, subsequent purchasers, and mortgagees in good faith, unless the mortgage, or a true copy thereof, be forthwith deposited as directed in the next section."

Section 4151 provides that chattel mortgages shall be deposited with the county recorder of the county in which the mortgagor resides, and they may, when filed, be recorded, if their respective owners desire. Section 4153. Under the state law, the bank's mortgage conveyed the property therein described to the bank, the title passing to it as general owner with the right of immediate possession on breach of condition. Robinson v. Fitch, 26 Ohio St. 659, 663; Lindemann v. Ingham, 36 Ohio St. 1, 9; Bates v. Wiles, 1 Handy (Ohio) 532. It was valid under the Ohio rule, as between the bank and Klein, whether it was filed or not (Francisco v. Ryan, 54 Ohio St. 307, 43 N. E. 1045, 56 Am. St. Rep. 711; Boyer v. Knowlton Co., 85 Ohio St. 104, 97 N. E. 137), but void as against contesting creditors, who, between the time of its execution and filing, had acquired rights or liens upon it by attachment, execution, or other appropriate legal steps for the payment of their debts (Wilson v. Leslie, 20 Ohio, 161; Brown v. Webb, 20 Ohio, 389; York Mfg. Co. v. Cassell, 201 U. S. 344, 26 Sup. Ct. 481, 50 L. Ed. 782; Re Shirley, supra). Therefore, when it was filed, it became operative as against all of Klein's other creditors, because none of them had fastened a valid right or lien upon the mortgaged property before its filing. In the Shirley Case Judge Day, speaking for this court, said:

"We reach the conclusion that under the Ohio statutes, as interpreted by the highest courts of the state, a chattel mortgage being wholly void as against certain creditors until filed, mere withholding it from record does not necessarily work a fraud upon the other creditors. Such withholding with the intent to defraud others undoubtedly invalidates the security. It is claimed that the mortgagee is estopped to assert his security as against others who dealt with the mortgagor on the faith of the property after the execution of the mortgage and before its record. But there can be no estoppel, in the absence of fraud, if the mortgagee simply held a security void until filed as against creditors who were at full liberty to assert their rights against the property. The mortgagor had an undoubted right to prefer creditors by giving to one a security denied to others. When the chattel mortgage is filed it becomes such preference only from the date of filing. Until filed, it is void as to 'creditors.' While this term is used without limitation in the statute, as construed by the Ohio Supreme Court, it means such creditors as have fastened upon the property before the filing of the mortgage. All other creditors must assail the security for fraud in order to defeat the preference."

It is clear from what has been said that the bank's mortgage was not given or taken with intent to hinder, delay, or defraud Klein's

creditors, or any of them, and that the bank is not estopped to claim under it unless such result flows from the amendment of February 5, 1903, to section 60a of the Bankruptcy Act. Although the bank's chattel mortgage, which was given to secure an additional loan as well as an antecedent debt, was executed and delivered in good faith when Klein, for aught that appears, was solvent, and was not fraudulently withheld from record, and the whole transaction relating to it was had in good faith, nevertheless, did the filing of it within four months of the institution of bankruptcy proceedings bring it within the disabilities of section 60a? The answer must be in the negative, if we concur in the views announced in Re Sturtevant, 188 Fed. 196, 110 C. C. A. 68 (C. C. A. 7), Meyer Bros. Drug Co. v. Pipkin Drug Co., 136 Fed. 396, 69 C. C. A. 240 (C. C. A. 5), Re Sayed (D. C.) 185 Fed. 962, and Debus v. Yates (D. C.) 193 Fed. 427, or if we adopt the necessarily logical conclusion flowing from Re Doran, 154 Fed. 467, 83 C. C. A. 265, decided by this court.

Under the bankrupt law as originally enacted, a transfer dated as of the time it was actually made without regard to the date of filing or recording. Cases consequently arose in which preferential transfers, though fraudulent and constituting acts of bankruptcy, could not be successfully assailed, even though the instruments evidencing them were filed or recorded, as the case might be, within four months of the filing of the petition in bankruptcy, because the transfers were made prior to the beginning of the four months' period. The withholding of such transfers from the files or record thus operated to defeat the benefit contemplated by the establishment of such period. To correct this defect in the law, the amendment of February 5, 1903, was made, whereby the words "within four months before the filing of the petition, or, after the filing of the petition and before adjudication," were eliminated from section 60b and inserted in section 60a, and also the words, "where the preference consists of a transfer, such period of four months shall not expire until four months after the date of recording or registering the transfer, if by law such recording or registering is required," were added at the end of section 60a. The purpose of section 60a, as originally enacted, was to define what judgments and what transfers are preferential, and it still performs that office. The added sentence prolonging the four months' period until four months after the date of recording or registering the transfer applies only to cases "where the preference consists in a transfer," and the conditional clause, "if by law such recording or registering is required," we interpret to mean, if by the law of the state by which the validity of the mortgage against contesting creditors is determined, such recording or registering is required. The purpose of the amendment was, we think, as stated in Re Sturtevant, to prevent preferential fraudulent transfers from escaping the four months' provision, unless they were filed or recorded, as the case may be, before that period began to run. It did not change the date as to which such transfers are to be judged in determining their voidable character. As was said in Debus v. Yates (D. C.) 193 Fed. 447, in speaking of the amendment of 1903:

"It simply prolonged the time in which, by the filing of a petition in bankruptcy, a recorded preferential transfer might be deemed to be a voidable preference. It had nothing whatever to do with changing the date as to which it was to be judged in determining whether all the elements of a voidable preference were present."

This view finds support in the fact that the amendment did not abrogate the well-settled rule that, to make a transfer preferential, the transferee's reasonable cause to believe that the debtor intended to give him a preference over other creditors must concur with the debtor's intent to give a preference. Re First Nat. Bank of Louisville, 155 Fed. 100, 84 C. C. A. 16 (C. C. A. 6); Re Leech, 171 Fed. 622, 96 C. C. A. 424 (C. C. A. 6); Hardy v. Gray, 144 Fed. 922, 75 C. C. A. 562 (C. C. A. 2); Curtiss v. Kingman, 159 Fed. 880, 87 C. C. A. 60 (C. C. A. 1); Tumlin v. Bryan, 165 Fed. 166, 91 C. C. A. 200, 21 L. R. A. (N. S.) 960 (C. C. A. 5). The debtor performs his part in reference to a transfer when it is made. The time at which the transfer instrument shall be filed and recorded is ordinarily determined wholly by the transferee. There may be, as in the present case, a transfer wholly free from preferential and fraudulent taint, a withholding for a laudable purpose as regards unsecured creditors and for a period wholly within the discretion of the transferee, and yet, if the preferential character of the instrument must be judged as of the date of its filing, the transfer then becomes preferential in the absence of any intent in that behalf on the part of the debtor. If this be the correct view of the statute, it then, not only postpones the time within which a transfer may be successfully assailed, but also materially alters the essential character of the transaction. To avoid such a result and the creation by construction of a transaction different from the actual one, the court in Re Jackson Brick & Tile Co. (D. C.) 189 Fed. 636, refused to apply the rule, which we are asked to adopt, to a transfer based on a present consideration; but if it has no application to a transfer based on a present consideration, which is not preferential, we see no reason why it should apply to a transfer which is not preferential, though based on a pre-existing debt, unless the state law, unlike that of Ohio, is such that the conveyance has no force and validity whatever as to creditors until filed or recorded. Speaking to this point, it was ruled in Re Sayed (D. C.) 185 Fed. 965:

"We find that the intent to give a preference * * * must exist on the part of the giver of the security at the time it is given, and the receiver must then have cause to believe that the giver has such intent. * * * The intent on the part of the transferrer must exist at the critical moment. If that moment be the instant of recording, how can it be said that the transferrer then has that intent, when he perhaps gave and delivered the instrument two years before, while he was perfectly solvent, and had continuously supposed that it was recorded, as might well be the case if the lack of recording had been from the carelessness of the secured creditor?"

The contention is not without merit that, because the amendment did not provide that transfers shall be judged as to validity as of the date of filing and without regard to their execution, section 60b was so amended June 25, 1910 (Act June 25, 1910, c. 412, § 11, 36

Stat. 842)', as to eliminate from preferential transfers the intent of the debtor and make them, when recordable and recorded, speak as of the date of recording. The action of Congress, it is true, in thus amending the statute is not necessarily such an admission of imperfection in the previous enactment of 1903 as to prevent judicial interpretation from giving it the same effect as the amendment imparts (School District v. Kelley, 120 Iowa, 119, 94 N. W. 284), but ordinarily such an amendment may be taken as indicating an intention to make some change in the previously existing law (Mosle v. Bidwell, 130 Fed. 334, 65 C. C. A. 533 [C. C. A. 2]).

By necessary implication the same result as is obtained here was reached by this court in Re Doran, 154 Fed. 467, 83 C. C. A. 265. The case arose under the statutes of Kentucky, which, as regards the subject-matter under consideration, are not dissimilar from those of Ohio. The amendment of 1903 was then in force. The mortgage, which was valid at its inception, was not recorded for more than fourteen months after its execution, or until within less than four months prior to the filing of the petition in bankruptcy. Debts were created between the date of the giving and the filing of the mortgage, but, as none of the creditors had fastened upon the mortgaged property before the mortgage was filed, it was sustained excepting as to the stock of goods from which sales were made by the mortgagor in the course of trade; the evidence failing to show what part, if any, of such stock passed into the hands of the trustee. The validity of the mortgage was necessarily measured as of the date of its execution and delivery.

Crucible Steel Co. v. Holt, 174 Fed. 127, 98 C. C. A. 101, decided by this court in 1909, involved the rights of a vendor who had made a conditional sale of goods under an agreement, which was not recorded, that the title was to remain in him until payment of the purchase price. Under the law of Kentucky, where the transaction occurred, such a sale amounts to a sale and a chattel mortgage back to the vendor, and is controlled by the provisions of the state statute concerning the recording of chattel mortgages. After the execution and delivery of the contract, but before the filing of the petition in bankruptcy, the bankrupt became indebted to certain parties, in whose behalf the trustee in bankruptcy contested the claim of the vendor as to the title to and right of possession of the goods sold. The vendor asked for the enforcement of a lien thereon and asserted priority over general creditors in the proceeds of their sale. The case differed from the Doran Case, in that in the latter the chattel mortgage had been filed. The difference, however, was not regarded as important, and we refused to disturb the ruling of the Doran Case and upheld the vendor's lien upon the goods in question for the unpaid purchase money. The Supreme Court, to which the case was appealed, in its opinion (Holt v. Crucible Steel Co., 224 U. S. 262, 32 Sup. Ct. 414, 56 L. Ed. 756), announced April 1, 1912, affirming this court, treated the instrument of sale as a valid unrecorded chattel mortgage. It affirmed its holdings in York Mfg. Co. v. Cassell, 201 U. S. 344, 26 Sup. Ct. 481, 50 L. Ed. 782, and Thomas v. Taggart, 209 U. S. 385, 28 Sup. Ct. 519, 52 L. Ed. 845, that the effect to be given to an

unrecorded chattel mortgage must be determined by the recording law of the state. The result obtained is in harmony with the conclusion reached in the Doran Case and does not consist with the contention here made by the trustee.

Loeser v. Savings Deposit Bank & Trust Co., 148 Fed. 975, 78 C. C. A. 597, 18 L. R. A. (N. S.) 1233 (C. C. A. 6), does not militate against the conclusion here reached. That case was decided with reference to the express stipulation that the bankrupt at the time of the execution and delivery of the mortgage was insolvent, and that the mortgagee had reasonable cause to believe at that time that she was insolvent, which condition existed at the time the mortgage was filed, and that the effect of enforcing the mortgage, if held valid, would be to enable the mortgagee to obtain a greater percentage of its debt than any other of the bankrupt's creditors of the same class. The question as to whether the validity of the mortgage should be determined as of the date of the making or of the recording was not involved.

We are not unmindful that there are reported cases which hold contrary to the foregoing, but the views above expressed are believed to be the better and are in accord with those heretofore entertained by this court.

As the validity of the bank's mortgage must be judged as of the date of its execution, and as under the Ohio law it was neither preferential nor fraudulent, and therefore not within the disabilities of section 60a, it must be sustained, excepting as to the stock of goods designed for consumption in the hotel and saloon.

The District Court is affirmed.