## In re MOSHER.

### FIRST NAT. BANK OF ALBANY, N. Y., v. HAMBLIN.

(District Court, N. D. New York. July 21, 1915.)

1. BANKRUPTCY ⬤⇒172—MORTGAGE BY BANKRUPT—RIGHTS OF HOLDER.

The assignee of a mortgage given by a bankrupt to third persons stands in no better position than his assignor, where he took with knowledge of all the facts.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 220; Dec. Dig. ⬤⇒172.]

2. PRINCIPAL AND SURETY ⬤⇒147—SECURITY GIVEN SURETY—RIGHTS OF CREDITOR.

Where a surety on a note was given a mortgage, the creditor is entitled to the benefit of the mortgage in case it is valid.

[Ed. Note.—For other cases, see Principal and Surety, Cent. Dig. §§ 402–412; Dec. Dig. ⬤⇒147.]

3. BANKRUPTCY ⬤⇒172—MORTGAGE BY BANKRUPT—VALIDITY—RECORDATION.

Real Property Law N. Y. (Laws 1896, c. 547) § 241, declares that mortgages may be recorded, and, if not recorded, shall be void as against any subsequent purchaser in good faith and for a valuable consideration whose conveyance is first recorded. A mortgage, given by a bankrupt for a valuable consideration more than four months before the filing of the petition in bankruptcy, was not recorded. *Held*, that such mortgage was valid as against the trustee in bankruptcy; he not being a subsequent purchaser in good faith.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 220; Dec. Dig. ⬤⇒172.]

4. BANKRUPTCY ⬤⇒175—CONVEYANCES—FRAUD OF CREDITORS.

Failure to record a New York mortgage is not, as to general creditors, a badge or indicia of fraud; the statute authorizing recordation not being for their protection.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 247, 248; Dec. Dig. ⬤⇒175.]

5. BANKRUPTCY ⬤⇒178—MORTGAGE BY BANKRUPT—VALIDITY—BONA FIDES.

A mortgage, given by one subsequently bankrupt, *held* intended to be valid and to be part of a transaction whereby he secured indorsers of his note.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 221, 264–274, 283, 284; Dec. Dig. ⬤⇒178.]

6. BANKRUPTCY ⬤⇒303—CONVEYANCES BY BANKRUPT—MORTGAGES—VALIDITY.

Evidence *held* insufficient to show that mortgagees who indorsed a note of one subsequently bankrupt and received the mortgage as security knew of his insolvency, or were guilty of any fraud in agreeing not to record the instrument.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 458–462; Dec. Dig. ⬤⇒303.]

7. BANKRUPTCY ⬤⇒181—PREFERENCES—WHAT CONSTITUTES.

Where one subsequently bankrupt, to obtain a loan, gave a mortgage to persons who indorsed his note, such mortgage is not a voidable preference within Bankruptcy Act (Act July 1, 1898, c. 541, 30 Stat. 562) § 60b, as amended by Act Feb. 5, 1903, c. 487, § 13, 32 Stat. 799, and Act June 25, 1910, c. 412, § 11, 36 Stat. 842 (Comp. St. 1913, § 9644); for a transfer, to constitute such a preference, must be on account of a pre-existing debt.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 259, 260, 271, 273, 274; Dec. Dig. ⬤⇒181.]

⬤⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

8. BANKRUPTCY ⟪184—FRAUDULENT CONVEYANCES—VALIDITY.

Where one subsequently bankrupt, to procure persons to indorse his note, gave them a mortgage, and they agreed as a favor to him not to record it, the mortgage was not invalid as a fraudulent conveyance, though Real Property Law N. Y. (Consol. Laws, c. 50) §§ 263–266, declares void conveyances fraudulently intended to hinder or delay creditors, it not appearing that the indorsers intended to withhold the instrument from record so as to defraud creditors, and there being no duty requiring them to record the instrument.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 275–277; Dec. Dig. ⟪184.]

9. BANKRUPTCY ⟪172—CONVEYANCES—ENFORCEMENT.

Where a mortgage which had not been promptly recorded was valid in the hands of a mortgagee who had indorsed a bankrupt's note to a bank, the bank, though it knew of the mortgagor's insolvency and of the delay in recording the mortgage, at the time of taking it over, may take over and enforce the conveyance.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 220; Dec. Dig. ⟪172.]

In Bankruptcy. In the matter of the bankruptcy of James T. Mosher. Contest as to the ownership or right to a fund of $7,348.14, derived from the sale of certain real estate of the above-named bankrupt, James T. Mosher, deposited in court under stipulation to await its decision as to the right thereto of the First National Bank of Albany, N. Y., under a certain mortgage given by the now bankrupt to Samuel G. Galib and Joseph G. Galib, comprising the firm of Galib Bros., who were indorsers on the notes of said Mosher given to said bank, and which mortgage was subsequently assigned to and is now held by said bank. Order of referee reversed, and moneys awarded to the bank.

John F. Gleason, of Albany, N. Y., for claimants Galib Bros.

Tracey, Cooper & Townsend, of Albany, N. Y., for claimant First Nat. Bank of Albany.

Geo. J. Hatt, 2d, of Albany, N. Y., for trustee.

RAY, District Judge. November 20, 1913, a petition in bankruptcy was filed against said James T. Mosher, and December 8, 1913, he was duly adjudicated a bankrupt. January 2, 1914, Emery A. Hamblin was duly appointed and qualified as trustee. Mosher, the now bankrupt, had been a customer of the First National Bank of Albany, N. Y., for some years prior to April 16, 1913, discounting paper at said bank from time to time, and on that day he informed Mr. Gallogly, the vice president of said bank, that he desired a loan of $10,000, in response to which Mr. Gallogly stated the bank would make the loan if secured. Mosher offered a second mortgage on his real estate, but Mr. Gallogly declined this, on the ground the bank could not make loans on mortgage, but at the same time informed Mosher he could give his note indorsed by some friend and secure such indorser by a mortgage on his real estate. Thereupon Mosher suggested Galib Bros. as indorser, and as Gallogly had known the said firm for some years and regarded the members as good business men and the firm responsible for a reason-

⟪For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

able amount, the note for $10,000 was made by Mosher, indorsed by Galib Bros., and Mosher executed and delivered to that firm the mortgage in question to secure it on such indorsement. The note, so indorsed, due in four months, was thereupon delivered to the said bank by Mosher and discounted by it for his benefit. In August, 1913, the note was renewed for two months, and October 20, 1913, was again renewed. In April, 1913, when Mosher applied to Galib Bros. for their indorsement, he informed that firm that he was a little short of money and desired to uphold his business. The members of the firm were acquainted with Mosher and his fellow countrymen, all being Armenians. Mosher at the time of giving the mortgage requested Galib Bros. not to record it, saying:

"Don't record it because I want to do some business. If you record it, it might be hard for me to do business"

—and thereupon Galib Bros. agreed not to record such mortgage. Of this agreement the said bank had no knowledge. This mortgage was not recorded until October 30, 1913, or 20 days prior to the filing of the petition in bankruptcy and 10 days subsequent to the last renewal of the note. November 5, 1913, Galib Bros. assigned such mortgage to the said bank, and the assignment was that day recorded. This was done under the following circumstances, viz.: In October, 1913, Mr. Gallogly, vice president of the bank, heard that Mosher was in financial trouble and gambling heavily, which Mosher admitted, and thereupon turned the matter over to its attorneys, who learned that the mortgage had not been recorded. Galib Bros. were sent for and informed of Mosher's financial condition and practices, and an assignment of the mortgage was thereupon requested and given. About this time Mosher offered the bank additional collateral security by way of chattel mortgage, but the bank declined, as under the then existing conditions it had no right to take same.

It conclusively appears that prior to taking the assignment of the mortgage to the bank Mr. Gallogly had become acquainted with Mosher's financial condition, but there is no evidence to sustain a finding that the bank, or any of its officers, had any knowledge of the true financial condition of Mosher at the time the $10,000 note was given, indorsed by Galib Bros, and at the time the mortgage was given by Mosher to Galib Bros. as security to them for their indorsement. Some point was made in the testimony that the note was indorsed and delivered prior to the execution and delivery of the mortgage. This is of no consequence, as the mortgage was given the same day that the note was executed and delivered, and with the understanding and agreement that the mortgage was to be given as a part of the transaction. Some point has also been made that the bank did not have actual knowledge that the mortgage was in fact executed and delivered at the time or on the day the note was indorsed and taken. This I regard as of no consequence, for the bank understood that Galib Bros. was to indorse the note and be secured by the mortgage executed by Mosher. It was all a part of the one transaction. There is no evidence or statement in the case that the bank declined to discount the note with Galibs' indorsement thereon, and required as a condition of

discounting the note that Galib Bros. be secured. The bank simply knew that Galib Bros. was to be secured by the giving of the mortgage, and understood that it had been done.

It is not disputed that from time to time Mosher, now bankrupt, made financial statements to various commercial agencies which were communicated to the trade for the purpose of obtaining credit. Such statements were made in February, 1913, August, 1913, and possibly at other times. Other parties investigated Mosher's condition by making inquiry and made reports as to his financial condition and the credit that was due him. The existence of the unrecorded mortgage was not disclosed by Mosher in making these financial statements, or in answer to inquiries made by other parties.

During all of this time, including the time when the $10,000 note was given and the mortgage executed, Mosher was insolvent. And thereafter, and while the mortgage remained unrecorded, it is a fact that various parties, relying upon the reports of the trade agencies and upon the information given to other parties in answer to inquiries, and upon the apparent equity of Mosher in this mortgaged property, filled orders given by Mosher and extended new and further credit to him. There is no evidence that Galib Bros., or either of the firm, was cognizant of the financial condition of Mosher at the time they indorsed the note and took the mortgage as security to their indorsement, and there is no evidence that the bank had any knowledge, at the time the note was discounted and the mortgage executed to secure the indorsement of Galib Bros., that Mosher was insolvent or financially embarrassed to a serious extent. Neither is there any evidence that the bank or Galib Bros. were informed that Mosher was making financial statements which concealed the existence of the mortgage. There is no evidence in the case, or in the statement of facts, that would justify the inference or conclusion or a finding that Galib Bros. neglected or failed to record the mortgage for the purpose of cheating or defrauding then existing, or subsequently existing, creditors of Mosher. Galib Bros. of course knew that a failure to record the mortgage would keep record knowledge of its existence from then existing and subsequently existing creditors of Mosher, but there is no evidence that they had any information which led them to believe, or which ought to have led them to believe, that Mosher would make any false or untrue statements as to the existence of such mortgage. When the mortgage was assigned to the bank it had knowledge for the first time of the agreement not to record it. I do not think it can be held or found that there was any express purpose or design on the part either of Mosher or Galib Bros., at the time the note was indorsed and the mortgage given, to cheat, defraud, deceive, or mislead existing creditors, or those persons who should subsequently become creditors. The mortgage at that time was not intended as a preference, inasmuch as it was given to secure Galib Bros. for its indorsement upon a note given for a new consideration; that is, a present loan of money made by the bank.

Under the conditions existing and known to Galib Bros. when the note was indorsed and the mortgage delivered, it was a valid security, unless the agreement not to record, entered into for the purpose stated, made it void as to general creditors who should thereafter become such.

Galib Bros. of course knew that Mosher desired the mortgage kept from record in order that he might secure credit upon the faith of his apparent ownership of the real estate unincumbered by this particular mortgage. Mosher expressed the wish that the mortgage be not recorded for that very purpose.

The real questions are:

1. Was this mortgage fraudulent and void as to the general creditors of Mosher, who thereafter extended credit to him on the faith of his real estate being unincumbered by such a mortgage? If so, it was void for the same reason in the hands of the bank. The bank did not discount the note on the faith of the mortgage being given to the indorsers as security. No evidence or concession sustains such a conclusion.

2. Was the bank entitled to an assignment of such valid security as the Galibs or Galib Bros. had?

3. Another question under the facts of this case is this: Is the mortgage deemed to have been given to secure an antecedent debt and given as of the date of its record and therefore within the four months preceding the filing of the petition in bankruptcy, or did the four-month period begin to run at the date of the record of the mortgage?

[1] If this mortgage was valid in the hands of Galib Bros. as a security for their indorsement on this note of $10,000, and could have been enforced by that firm and it was competent for Galib Bros. to transfer this security to the bank as security for the payment of the note, then it is good and valid in the hands of the bank. The bank, however, is in no better position than its assignor, Galib Bros.

[2] On the second proposition stated there can be no serious contention. Catskill National Bank v. Dumary, 206 N. Y. 550, 558, 559, 100 N. E. 422, 425, and cases cited. The court says:

"A rule within those constituting the doctrine of subrogation is that the creditor shall have the benefit of any obligations or collateral securities which the principal debtor has given to the surety or person standing in the situation of a surety. Such securities are regarded as trusts for the better security of the debt, and the fact that the creditor did not originally rely upon the credit of such collateral security, or know of its existence in the first instance, is immaterial. Vail v. Foster, 4 N. Y. 312; Curtis v. Tyler, 9 Paige [N. Y.] 432; National Bank of Newburgh v. Bigler, 83 N. Y. 51; Wager v. Link, 134 N. Y. 122 [31 N. E. 213]; Keller v. Ashford, 133 U. S. 610 [10 Sup. Ct. 494, 33 L. Ed. 667]; New London Bank v. Lee, 11 Conn. 112 [27 Am. Dec. 713]; Meyers v. Campbell, 59 N. J. Law, 378 [35 Atl. 788]; First Nat. Bank v. Hunton, 70 N. H. 224 [46 Atl. 1049]; Matter of Fickett, 72 Me. 266; Kramer & Rahm's Appeal, 37 Pa. 71. The rule is applicable here. The right of subrogation is founded upon principles of equity, and not in contract. It is to be so administered as to accomplish, through general equitable rules, what is just and fair between the parties. It does not depend upon privity, nor is it confined to cases of strict suretyship. Subrogation is an act of law, and a mode which it adopts to compel the ultimate discharge of the debt by him who in good conscience ought to pay it, and to relieve him whom none but the creditor could ask to pay. If in the performance of a contract conditions arise which require to effect such result the intervention of the right, the court will so decree, provided that in so doing the law is not violated or a contract altered. Pease v. Egan, 131 N. Y. 262 [30 N. E. 102]; Morehouse v. Brooklyn H. R. R. Co., 185 N. Y. 520 [78 N. E. 179, 7 Ann. Cas. 377]; Arnold v. Green, 116 N. Y. 566 [23 N. E. 1]. The defendant became surety to the Brick Company for the payment of the debt of the Contracting Company. His guaranty was a separate, independent contract that he would pay the debt if the company did not. He placed his financial responsibility as

a security for the payment of the purchase price of the bricks. The trust for the better security of the debt attached to the guaranty as it would have attached to property deposited by the Contracting Company with the Brick Company as security."

There is no pretense or evidence to show that the bank connived at keeping the mortgage from record, or in the making of representations as to the financial condition of Mosher. The main question is, Could Galib Bros. have enforced the mortgage on payment of the note? There is no pretense that that firm is not liable to the bank on its indorsement.

[3, 4] A mortgage given and received in fraud of creditors, or to hinder, delay, or defraud creditors is invalid as to creditors. But a mortgage not so given, that is, not given and received for such a purpose, if there be a good present consideration and it is given more than four months prior to the filing of the petition in bankruptcy in New York, is good and valid as to creditors and the trustee in bankruptcy, whether recorded or not. Under the Bankruptcy Act a mortgage is not "required" to be recorded as to general creditors and a trustee in bankruptcy, when it is not required to be recorded except as to subsequent purchasers in good faith and subsequent mortgages. If good as to general creditors without being recorded, then as to general creditors and the trustee in bankruptcy representing them and their interests it is not "required" to be recorded within the meaning of the Bankruptcy Act. In re Boyd (C. C. A., Second Circuit), 213 Fed. 774, 130 C. C. A. 288, approving In re Hunt (D. C.) 139 Fed. 283; In re Klein (Dougherty v. First National Bank of Canton), 197 Fed. 241, 116 C. C. A. 603, 28 Am. Bankr. Rep. 263 (C. C. A., Sixth Circuit); Little v. Holley-Brooks Hardware Co., 133 Fed. 874, 67 C. C. A. 46 (C. C. A., Fifth Circuit); Meyer Bros. Drug Co. v. Pipkin Drug Co., 136 Fed. 396, 69 C. C. A. 240 (C. C. A., Fifth Circuit); In re Sturtevant, 26 Am. Bankr. Rep. 574, 188 Fed. 196, 110 C. C. A. 68 (C. C. A., Seventh Circuit); Telford v. Hendrickson, 120 Minn. 427, 139 N. W. 941, 31 Am. Bankr. Rep. 866. I am fully aware there are cases to the contrary, but the case of In re Boyd, supra, having been decided by the Circuit Court of Appeals in this circuit, is binding upon the court.

The New York statute in effect simply declares that an unrecorded real estate mortgage is not good as a lien as against—

"subsequent purchaser in good faith and for a valuable consideration, from the same vendor, his heirs or devisees, of the same real property or any portion thereof, whose conveyance is first duly recorded."

It is good against such purchasers unless they first record their conveyances. The statute as to recording such a mortgage is permissive. The language is—

"may be recorded in the office of the clerk of the county where such real property is situated."

Then comes the penalty for not recording, viz.:

"Every such conveyance not so recorded is void as against any subsequent purchaser in good faith and for a valuable consideration, from the same vendor, his heirs or devisees, of the same real property or any portion thereof, whose conveyance is first duly recorded."

In New York a mortgage of real estate not recorded is good and valid as to all the world except the class of persons, expressly described, who purchase in good faith, pay a valuable consideration, and first record their conveyances. Real Property Law, § 241 (Laws 1896, c. 547, p. 607). In New York the filing of chattel mortgages stands on an entirely different footing. Skilton v. Codington, 185 N. Y. 80, 77 N. E. 790, 113 Am. St. Rep. 885. This real estate recording statute is not designed to "require" mortgages to be recorded generally, or as to general creditors, but to protect subsequent purchasers of the property who purchase in good faith, without notice of the prior unrecorded mortgage or deed, and who pay a valuable consideration, and who first record their mortgage or deed. A purchaser for a present valuable consideration has a good title and a mortgagee for a present valuable consideration has a good and valid lien even if they fail to record their conveyances, except as to subsequent purchasers and mortgagees in good faith of the same property, or any part of same, who pay a valuable consideration and first record, and these persons may, if they desire, protect themselves against prior unrecorded conveyances and subsequent conveyances by recording. It is a permissive and protective statute, and not a mandatory one. It protects subsequent purchasers and mortgagees who purchase in good faith, pay a valuable consideration, and first record. As to such persons the prior unrecorded conveyance is a nullity, but not as to any other person or persons. The recording statute was not designed to protect general creditors, or those extending credit. Failure to record in no sense affects the validity of the unrecorded conveyance except as to the subsequent conveyances mentioned. Trustees in bankruptcy are not subsequent purchasers in good faith and for value, but the title and ownership of the real property of the bankrupt vests in them—is devolved upon them—by operation of law, subject to all existing valid liens not affected by fraud and equities, in favor of other parties. And failure to record, of itself, is not as to general creditors a badge or indicia of fraud. It is a circumstance which, with other facts and circumstances, may be evidence of a purpose to defraud or aid in defrauding. Failure by the holder, grantee, or mortgagee to record a deed or mortgage is not a representation by him that his grantor or the person in whose name the record title stands either owns the property, or owns it free and clear of his unrecorded mortgage.

[5] Was this mortgage given and recorded as a mere friendly act, not intended to be bona fide, or to create a lien on the property mortgaged? I think not. The agreed state of facts and testimony of Galib as a whole does not establish such contention. I cannot so construe them. This is not a case where the instrument was made within the four months pursuant to an agreement to give a mortgage at a future time. True the note was actually executed and indorsed before the mortgage was actually executed and delivered, but it was all done the same day, as stated, and pursuant to the understanding that the one act was to accompany the other.

[6] Assuming that Mosher was insolvent when he procured the loan from the bank on Galib Bros.' indorsement, there is not a scin-

tilla of evidence that either the bank or Galib Bros. actually knew this fact. Mosher was doing business, and expressed a purpose to continue business, and unless the borrowing of $10,000 indicated insolvency, there was nothing to put Galib Bros. on inquiry. It does not appear that this was an extraordinary loan for Mosher to secure. The bank required an indorsement of the note, and told Mosher he could have the money on an indorsed note, and could secure the indorser. But this does not indicate that the bank supposed, or had any cause to believe, that Mosher was insolvent, or that any fraud was intended. It seems that Mosher offered to secure Galib Bros. on their indorsement. But this does not show that Galib Bros. knew that he was insolvent or seriously involved financially. Obtaining their indorsement establishes nothing of the kind, or that Galib Bros. had reasonable cause to believe Mosher was insolvent. That firm had indorsed for him before to the extent of $3,000, and so far as appears the note had been paid. There is no evidence that at the time the mortgage was given Mosher was gambling, or drinking, or not paying attention to business. It is undisputed that when the mortgage was given Mr. Galib inquired of Mr. Nellis, the attorney who drew it, if it was necessary to record it and he stated that it was not. This advice was not given because of any agreement or understanding that the mortgage was not to be a lien or actual security for the indorsement. So far as appears it was given and accepted in good faith, unless it be that the agreement not to record shows its absence. Mr. Samuel G. Galib, one of the firm, who seems to have done the business, testified:

"Q. Will you please state the circumstances leading up to the execution and the delivery of that bond and mortgage to you? What the mortgage was given for and all of the circumstances connected with it? A. The mortgage was given to us to secure our indorsements on Mosher's notes to the First National Bank. Q. In what sum were these notes? A. $10,000. Q. When was the mortgage given? A. It was given in Mr. Nellis' office. Q. By which you mean Mr. Merwin H. Nellis of this city?' A. Mr. Nellis, Jr.; yes, sir. Q. At whose request did you go to Mr. Nellis' office? A. Mosher's. Q. State what took place there, describing all the transactions in detail?"

Here objections were interposed, but he was finally allowed to answer. Of the competency of the testimony there can be no question. It was then and there that the mortgage was drawn, delivered, and accepted. This was the transaction the validity of which is in question; this the res gestæ.

"A. Mr. Mosher, and my brother, and Mr. Nellis and myself were there. And when Mr. Nellis drew the mortgage, before signing it we asked him if we could go and show it to another party to see if it was all right or not, and he said 'Certainly, you can.' Mosher and I went to Mr. Gleason's office, and Mr. Gleason read over the mortgage, and he suggested that a few things should be in the mortgage, which he wrote on a slip of paper and gave to us to take to Mr. Nellis. And so we took down the mortgage to Mr. Nellis, and Mr. Nellis accepted the changes. In the meantime, after signing the mortgage, we asked Mr. Nellis if this mortgage should be put on record. He said, 'Not necessarily.' He said, 'This is a blanket mortgage and don't have to be on record.' And he went in the back room, I suppose he talked to his father. He went to his father and had a conversation with him, and he came back and told us we didn't have to put the mortgage on record. So, finally, we took the mortgage over and kept it to ourselves. Later on, when we heard that

Mosher was gambling heavily, we went to Mr. Gleason and told him the facts, and he said, 'Let me have the mortgage,' and I said, 'The mortgage is with us here,' and he said, 'Why didn't you have it on record?' and we said, 'Mr. Nellis told us we didn't have to put it on record, being a blanket mortgage,' and he said, 'Go and put it on.' * * *

"Mr. Hatt: Q. Mr. Galib, you indorsed the $10,000 note for Mosher prior to receiving and prior to the execution of the mortgage which you subsequently took on his property? A. Yes. Q. And without receiving any security at the time you indorsed it, did you not? A. Yes.

"Mr. Hatt: Q. On the same day that you indorsed the note? A. I think it was. * * *

"Mr. Savage: Q. The mortgage was given to secure your indorsement? A. Yes. Q. Mr. Hatt asked you if you had indorsed the note before you got the mortgage, and you answered that you had. At that time did you, or did you not, understand that you were to get a mortgage to secure your indorsement? A. Certainly we understood so. Q. What was your delay in getting the mortgage? A. It was done right the same day."

It is not questioned that the mortgage was executed and delivered the same day the note, or notes, was indorsed. It is agreed that before the note and mortgage were executed:

"Mosher told the Galibs when he asked them to indorse the note that he was a little short of money and wanted to uphold his business. They had known Mosher a good many years, were fellow countrymen, and agreed to do it. Mosher asked them not to record the mortgage, saying, 'Don't record it, because I want to do some business. If you record it it might be hard for me to do business'—and they agreed to withhold it from record. Of this agreement the bank had no knowledge. Galibs admit that they made no investigation as to Mosher's liabilities, that they knew he was in business, and that his credit would be affected by the recording of the mortgage. Mr. Samuel G. Galib testifies: 'The transaction between Mr. Mosher and us was merely a friendly matter; we had previously indorsed his notes to the amount of $3,000. We thought, of course, that this mortgage was not really a lien against the property. It was merely a security for these notes.' Galib never received any interest on the mortgage; 'it was merely done for a favor.'"

Is there anything here that put Galib Bros. on inquiry, or made it incumbent on that firm to inquire of Mosher as to his financial condition and charge them with all the knowledge they might have obtained? This was not the obtaining security for the payment of an antecedent indebtedness, but security for the present indorsement of Mosher's note or notes to the extent of $10,000.

An agreement not to file a chattel mortgage is a badge of fraud, and may invalidate it as to subsequent creditors. Such a mortgage is required to be filed, and is notice to all subsequent creditors, and intended as such. Filing a chattel mortgage is for the purpose of giving notice. To agree not to file is substantially equivalent to agreeing not to give notice. It is not conclusive, but a circumstance of more or less cogency, and there must be some proof of actual fraud as distinguished from constructive fraud, based on a failure to record. Collier on Bankruptcy (10th Ed.) page 957, and cases there cited. · Is this true of a real estate mortgage? If it is "required" to be recorded within the meaning of the Bankruptcy Act, and is not recorded until within the four-month period, it is a preference if not given in good faith and for a present adequate consideration; that is, is given to secure an antecedent debt.

[7] A transfer by an insolvent person to constitute a voidable preference (I am not speaking of a fraudulent transfer) under section 60b of the Bankruptcy Act of July 1, 1898, as amended, must be on account of a pre-existing debt. Ernst v. Mechanics' & M. National Bank, etc., 201 Fed. 664, 120 C. C. A. 92, decrees affirmed National City Bank of New York v. Hotchkiss, 231 U. S. 50, 34 Sup. Ct. 20, 58 L. Ed. 115, and Mechanics' & M. National Bank, etc., v. Ernst, 231 U. S. 60, 34 Sup. Ct. 22, 58 L. Ed. 121; Collier on Bankruptcy (8th Ed.) p. 664; Loveland on Bankruptcy (4th Ed.) § 512; Coder v. Arts, 152 Fed. 943, 82 C. C. A. 91, 15 L. R. A. (N. S.) 372; Id., 213 U. S. 223, 29 Sup. Ct. 436, 53 L. Ed. 772, 16 Ann. Cas. 1008.

In the case now before this court there was a present valid and adequate consideration for the execution and delivery of the mortgage, viz., the indorsement by Galib Bros. of Mosher's note for $10,000, and the mortgage was given to secure the indorsement, that is, secure Galib Bros. against loss by reason of that firm lending their credit becoming responsible for the payment of such note. The note was at once discounted, and Mosher had the money. So far as appears, it was used by him for legitimate purposes in his business. It is a somewhat startling and novel proposition that, if A. borrows money of B. for the conduct of his business and evidences the debt by his promise to pay negotiable note, indorsed by C., A. cannot secure C., as a condition of his making the indorsement, by giving a mortgage on his real estate, even if A. is insolvent at the time, but C. is ignorant of the fact. Is it possible that before indorsing and taking his security therefor C. must inquire of A. as to the condition of his business and as to his solvency? And suppose that A. does ask C. not to record such mortgage for the reason the recording of it would injure his business and credit, and C. agrees that he will not record, thereby taking his chances that A. will not execute any other conveyance by way of deed or mortgage, is this of itself either a preference or a fraud? In such case there is no proof of actual fraud, and it seems clear there is no constructive fraud, as under the New York statutes general creditors are in no wise affected by the nonrecording of a real estate mortgage. In the Matter of the Metropolitan Dairy Co., Bankrupt, 224 Fed. 444, —— C. C. A. ——, decided June 22, 1915, the Circuit Court of Appeals, in this, the Second, circuit, said:

"It is a wholly novel proposition to us that the officer and director of a corporation which is losing money, is in financial straits, and facing imminent failure may not lend it money of his own on its mortgage of its personal property—to secure only the cash turned over, without any subterfuge, including any existing indebtedness to him. No authority to such a proposition is cited; certainly neither the Bankrupt Act, nor section 66 of the New York Corporation Law, supports it. It certainly is not giving a preference to give security on free assets to the extent of new hard cash paid into the treasury by any one."

In Coder v. Arts, 213 U. S. 223, 29 Sup. Ct. 436, 53 L. Ed. 772, 16 Ann. Cas. 1008, it was held by the Supreme Court:

"In this case a mortgage given within four months of filing the petition to secure advances, and while the mortgagee did not know of the mortgagor's insolvency, although the latter did, and which mortgage was found not to have

been made with intent to hinder, delay, or defraud creditors, held not to be voidable under section 67e of the Bankruptcy Law, and that the mortgagee was entitled to priority thereon with interest."

[8] I discover nothing whatever in this case to impeach the validity of the mortgage given to Galib Bros. as security for their indorsement, unless it be the agreement by that firm not to record it. A finding of fraud which will invalidate the mortgage cannot be predicated or based on the mere fact that it was withheld from record. There must have been a fraudulent intent on the part of Galib Bros. in withholding it from the record. Thomas v. Kelsey, 30 Barb. (N. Y.) 268, cited in Pond v. Harwood, 139 N. Y. 125, 34 N. E. 768. It was there held:

"A mortgage, being a valid instrument, as between the mortgagor and mortgagee, a subsequent judgment creditor has nothing to say, in respect to its being recorded or otherwise. The recording act relates to subsequent purchasers in good faith and for a valuable consideration, and not to judgment creditors. A subsequent judgment will not be preferred over a prior unregistered mortgage given to secure future advances or liabilities, unless there has been a fraudulent intent, on the part of the mortgagee, in withholding his mortgage from the record. The mere fact of retaining a mortgage six or seven months, without having it recorded, will not operate as a fraud upon subsequent creditors of the mortgagee, by the mortgagor, so as to postpone the mortgage to their judgments."

The court also said, all concurring:

"There is no case holding that a mortgage to secure future advances, or the liability to be incurred by future indorsements, must be recorded, to protect the mortgagee against subsequent judgments."

The recording of an incumbrance upon property [real] is notice to subsequent purchasers or incumbrancers only and has no retrospective effect upon prior lienors. Ackerman v. Hunsicker, 85 N. Y. 43, 39 Am. Rep. 621. The recording of a deed or mortgage is constructive notice only to those who have subsequently acquired some interest or right in the property under the grantor or mortgagor. Williamson v. Brown, 15 N. Y. 354.

The sole object and effect of the recording acts is to protect subsequent purchasers and incumbrancers against previous deeds, mortgages, and liens which are not first recorded, and the record of a deed or mortgage is constructive notice to those only who subsequently acquire an interest or right in the property under the mortgagor or grantor. Stuyvesant v. Hall, 2 Barb. Ch. (N. Y.) 151; Stuyvesant v. Hone, 1 Sandf. Ch. (N. Y.) 419; Hall v. Nelson, 23 Barb. (N. Y.) 88; Id., 14 How. Prac. (N. Y.) 32.

If, as to general creditors, Galib Bros. had a perfect right not to record this mortgage, and it was not a badge of fraud not to record it, how could it be a fraudulent act to agree not to record it so far as general creditors are concerned, that firm having no notice Mosher would run in debt on false representations, or that he was in fact insolvent? How can it be a fraud as to general creditors to agree not to do that which the person charged with fraud had a perfect right not to do? If the evidence should show that such person in so agreeing was acting to aid a scheme or purpose to defraud, it would be

different, of course. In such case the agreement to be inactive might evidence a participation in the fraudulent scheme—an aiding of it, and a fraudulent intent. When a person goes to the records and finds that A., his customer seeking credit, owns of record real estate, and that, so far as the records are concerned there is no incumbrance, he has no right to assume that it is unincumbered by mortgage, as he is presumed to know the law, and that so far as general creditors are concerned it does not demand or require that mortgages be recorded. In such case he should go to the owner and make inquiries of him. If misinformed by him, and it should appear that this misinformation was given credence by the nonrecording of a mortgage pursuant to an agreement not to record, entered into for that purpose, a very different case would be presented. In the instant case no such facts appear. Sections 263–266, Real Property Law of New York, provide as follows:

"Sec. 263. Conveyances with Intent to Defraud Creditors Void.—A conveyance or assignment in writing or otherwise, of an estate, interest, or existing trust in real property, or the rents or profits issuing therefrom, or a charge on real property, or on the rents or profits thereof, made with the intent to hinder, delay or defraud creditors, or other persons, of their lawful suits, damages, forfeitures, debts or demands, or a bond or other evidence of debt given, suit commenced or decree or judgment suffered, with the like intent, is void as against every person so hindered, delayed or defrauded.

"Sec. 264. Conveyances Void as to Creditors, Purchasers and Incumbrancers, Void as to Heirs and Assigns.—A conveyance, charge, instrument or proceeding, declared by this article to be void as against creditors, purchasers or incumbrancers, is equally void as against their heirs, successors, personal representatives or assigns.

"Sec. 265. Fraudulent Intent, Question of Fact.—The question of fraudulent intent in a case arising under this article, shall be deemed a question of fact and not of law; and a conveyance or charge shall not be adjudged fraudulent as against creditors, purchasers or incumbrancers, solely on the ground that it was not founded on a valuable consideration.

"Sec. 266. Rights of Purchaser or Incumbrancer for Valuable Consideration Protected.—This article does not in any manner affect or impair the title of a purchaser or incumbrancer for a valuable consideration, unless it appears that he had previous notice of the fraudulent intent of his immediate grantor, or of the fraud rendering void the title of such grantor."

My conclusions are:

1. That there was no preference, as the mortgage was accepted in good faith as security for a present indorsement by the mortgagee of Mosher's note for $10,000, and that this was an adequate present consideration for its execution and delivery. Therefore there was no constructive fraud. Also, that the Bankruptcy Act as to general creditors does not require such a mortgage to be recorded, and as it was given more than four months prior to the filing of the petition, it can only be avoided for actual fraud, although not recorded until within four months of the filing of the petition in bankruptcy.

2. That as Galib Bros. did not know Mosher was insolvent, had no information which imposed on that firm the duty of making inquiry so as to charge the firm with knowledge of his insolvency when the mortgage was given, and as there was no duty to record or obligation resting on Galib Bros. so far as general creditors were concerned, the agreement not to record the mortgage does not establish fraud.

3. That the mortgage was a good and valid security in the hands of Galib Bros., that the firm could have enforced it, and that the bank had the right to an assignment thereof, and occupies the same position Galib Bros. did.

[9] 4. The facts that the bank, when it took the assignment, had learned that Mosher was then insolvent, and was insolvent when the mortgage was given, and that recording had been postponed pursuant to an agreement between Mosher and Galib Bros. do not avoid or defeat the mortgage as a valid security in the hands of the bank, the holder of the note secured thereby.

This case is not within and covered by the case of Blennerhassett v. Sherman, 105 U. S. 100–117 (26 L. Ed. 1080), where it was held:

"1. A mortgage of his entire estate, executed by an insolvent mortgagor to a creditor, who knows of his insolvency, and who, for the purpose of giving him a fictitious credit, actively conceals the mortgage, withholds it from record, and represents him as having a large estate and unlimited credit, by which means he is enabled to contract other debts which he cannot pay, is void at common law.

"2. A mortgage executed by an insolvent with intent to give a preference to a creditor, who has reasonable cause to believe him to be insolvent, and knows that it is made in fraud of the provisions of the Bankrupt Act, and who, for the purpose of evading them, actively conceals it and withholds it from record for two months, is void, although executed more than two months before the filing of a petition in bankruptcy by or against the mortgagor."

There the court said, and we assume advisedly:

"It is not to be disputed that, except as forbidden by the bankrupt law, a debtor has the right to prefer one creditor over another, and that the vigilant creditor is entitled to the advantage secured by his watchfulness and attention to his own interests. Neither can it be denied that the mere failure to record a mortgage is not a ground for setting it aside for the benefit of subsequent creditors who have acquired no specific lien on the property described in the mortgage.

"But where a mortgagee, knowing that his mortgagor is insolvent, for the purpose of giving him a fictitious credit actively conceals the mortgage which covers his entire estate and withholds it from the record, and while so concealing it represents the mortgagor as having a large estate and unlimited credit, and by these means others are induced to give him credit, and he fails and is unable to pay the debts thus contracted, the mortgage will be declared fraudulent and void at common law, whether the motive of the mortgagee be gain to himself or advantage to his mortgagor."

It is obvious that no such state of facts have been shown in the case at bar. So far as the evidence and agreed statement show, the firm of Galib Bros. was ignorant of the insolvency of Mosher, of his running in debt and making untrue statements, and of his purpose so to do, and they made no statements or representations whatever as to his financial condition or responsibility, and were not called upon to do so.

In Re National Boat & Engine Co. (Butterfield v. Woodman) (D. C.) 216 Fed. 208, Judge Hale, at page 214, correctly stated the doctrine of the Supreme Court of the United States, viz.:

"Where, by collusion of the mortgagor, the mortgagee withholds a mortgage from record for the purpose of giving the mortgagor a fictitious credit, and inducing others to give him credit, * * * the mortgage is fraudulent at common law."

As repeatedly stated, the evidence in this case at bar fails to establish such purpose or intent on the part of Galib Bros. Fraud must be proved. It cannot, to defeat a mortgage, be inferred from conceded or proved facts, except when the inference of a fraudulent intent and purpose is the only natural or reasonable one under all the known and proved facts and circumstances of the case. As already stated, Galib Bros. knew that if a prospective creditor of Mosher looked at the records, he would not find their mortgages of record. That firm also knew they were under no obligation or. duty to such a person to put the mortgage on record. The firm also knew it would be the duty of such person, would he become informed, to inquire of Mosher, and Galib Bros. had the right to assume that if such person did inquire, he would be correctly and truly informed of the existence of the mortgage. That firm had no reason to apprehend false statements or fraudulent conduct on the part of Mosher. This case discloses no connivance or purpose on the part of either of the Galibs to misinform inquirers or mislead. I know of no moral or legal obligation resting on the holder of an unrecorded real estate mortgage to give the fact publicity, or make its existence a matter of common gossip or notoriety. Failure to record is not concealment as to general creditors. The Legislature has disclosed its policy by making it essential for the owner of such a mortgage to record as to subsequent purchasers and mortgagees who first record only. There may be states where their recording statutes differ from those of New York, but in this case the New York recording acts control.

Lastly. The order of the referee must be reversed, and an order made awarding the money in controversy to the bank, to be applied on the note.

So ordered.