## In re PAUL DE LANEY CO., Inc.

District Court, W. D. New York.  June 25, 1929.

See also (D. C.) 23 F.(2d) 737; (D. C.) 26 F.(2d) 937, 961.

Charles F. Blair, of Buffalo, N. Y., for trustee.

Wilcox & Van Allen, of Buffalo, N. Y. (John W. Van Allen and Selby G. Smith, both of Buffalo, N. Y., and Meyer H. Gladstone, of Chicago, Ill., of counsel), for claimant.

Arthur S. Tennant and Edwin G. O'Connor, both of Westfield, N. Y., for State Bank of Brocton.

Glenn W. Woodin, of Dunkirk, N. Y., for Dunkirk Trust Company.

HAZEL, District Judge.  ██ This matter now comes before me in the nature of a rehearing on the claim of George B. Renneker, holder of corporate bonds in the Paul De Laney Company, Inc., a bankrupt, of the face value of $130,000. The corporate bond issue was secured on September 1, 1921, by a trust mortgage in the amount of $750,000 to the Marine Trust Company, covering real estate, plant, and equipment at Brocton, N. Y. The estate of the bankrupt having been sold in this court, the claims of bondholders, by consent, were transferred to the fund ($161,390.87) realized from the sale free and clear of liens. Disputes in relation to the bonds have heretofore been determined except as to the claim of Renneker, which was recommitted to the special master by the Circuit Court of Appeals for further proof as to the validity of a certain mortgage executed by the bankrupt to Renneker, pursuant to agreement and prior asserted authorization of the stockholders. After taking testimony on both sides on the new reference, but before reaching a decision, the special master died, and on such tes-

timony a hearing has now been had before me. On the former hearing, it was held that Renneker's bonds constituted an issue for a pre-existing debt and was within the inhibition of the state statute, which in terms provides that no stocks or bonds shall be issued by a corporation except for money, labor done, or actually received for its use. The Circuit Court of Appeals (In re Paul De Laney Co., Inc., 26 F.(2d) 961) did not agree with this conclusion. It appeared, the learned court said, that the bankrupt had executed a mortgage dated January 3, 1921, on its real estate to secure claimant the return of certain securities pledged by him with the Bank of Buffalo to extend the bankrupt's line of credit; that the mortgage apparently was executed pursuant to a resolution of the directors of the bankrupt company, adopted October 7, 1920, as security for the amount of collateral put up by Renneker.

The resolution states the willingness of Renneker to tender collateral mortgages and other securities, amounting to $150,000, to be used to raise funds necessary to finance the season's press of grapes, provided the bankrupt secured him by its note and a trust deed or mortgage on its real estate "to protect him in the event of the failure of the Paul De Laney Co., to return to him any such collateral or other security as by him delivered to the Paul De Laney Co." Prior to the adoption of the resolution, the bankrupt owed the Bank of Buffalo $150,000, and, on applying for an additional loan of $100,000, Renneker deposited securities, as set forth in the resolution, valued at $109,000, and to secure another credit at said bank, both he and De Laney gave their personal guaranty. On October 6, 1920, the indebtedness of the bankrupt was $300,000. Although the securities were put up and the promissory note of the bankrupt company, amounting to $150,000, was delivered to him, the mortgage or trust deed was not signed and delivered until January 3, 1921. It was not recorded. Subsequently, on July 7, 1921, the bankrupt, at a regular meeting of its shareholders, authorized the issuance of corporate bonds, amounting to $750,000, to be secured by a first mortgage to the Marine Trust Company. In September, 1921, corporate bonds of the face value of $300,000 were delivered to the Bank of Buffalo as security for its indebtedness; and in January, 1922, after negotiations, said bank released to the bankrupt company bonds amounting to $150,000, which, it was stated at the time, were to be sold in Chicago and the proceeds of sale, to the amount of $120,000, applied on its indebtedness to the bank. These bonds were turned over by the bankrupt to Renneker, who, instead of having them sold, pledged them to the Union Trust Company of Chicago as security for a loan with which presumably he paid the bank $100,000 on account, receiving back his personal guarantee and pledged securities. The bonds are the bonds with which we are herein concerned,[1] for throughout the hearings it has been accepted that Renneker owned them. There is no doubt that his loan of securities established a line of credit for the bankrupt company and was the consideration for the bankrupt giving or agreeing to give a mortgage to insure the return of the securities (Westinghouse Mfg. Co. v. Brooklyn Rapid Transit Co. [D. C.] 288 F. 221), and that the subsequent cancellation of this mortgage was sufficient consideration for taking the bonds of bankrupt in its place—bonds surrendered to the bankrupt by the Bank of Buffalo. It was a good mortgage between the parties. Payne v. Wilson, 74 N. Y. 348; and see Hamilton Trust Co. v. Cleines, 17 App. Div. 152.

In treating of the cancellation of the mortgage which was withheld from record and the acceptance of a part of the pledged bonds, the Circuit Court of Appeals said: "The cancellation of the mortgage no doubt consisted in merely continuing to withhold it from record with the knowledge that the new trust mortgage was to be made and recorded, but this was as effective a release as any. Granting that it was done pursuant to the understanding testified to, the bankrupt was under obligation to give Renneker the bonds agreed upon as a substituted security. The bonds delivered to him in January, 1922, should be treated as given in performance of that obligation. Apparently these bonds were part of the $300,000 lot invalidly pledged to the Bank of Buffalo as security for its pre-existing loan. But the invalidity which adhered to them while held by the bank does not follow them into the hands of Renneker. He did not take them by assignment from the bank. The bank redelivered them to the bankrupt. They were then like bonds which had never been issued. The bankrupt could issue them for a valid consideration, and did, so in sending them to Renneker pursuant to its obligation to give them to him as a substituted security."

Now the sole point of dispute arises from

[1] Bonds amounting to $20,000 had been returned to the bankrupt, leaving $130,000.

the asserted invalidity of the mortgage in question because of failure to authorize or ratify its issuance at a meeting of the shareholders, and as required by the statute law of this state, namely, by the affirmative action of two-thirds of the capital stock. If the mortgage was invalid, its relinquishment by Renneker, or cancellation, was not based upon a good and valuable consideration for transferring the bonds to Renneker; but, if on the other hand, the mortgage was valid, its cancellation, pursuant to the arrangement with De Laney, constitued a sufficient consideration.

The testimony of claimant relating to the authorized issue of the mortgage by the shareholders, as required by section 16 of the Stock Corporation Law of this state (Consol. Laws, c. 59), substantially shows that either in October, November, or December, 1920, he came to Brocton, N. Y., represented his ownership of 1,340 shares and in possession, or having under his control, 50 or 60 proxies of other shareholders of the value of $60,000, to attend a special meeting of the shareholders of the bankrupt company, which had previously been called, and that at such meeting, attended by the witnesses Sharp, Anstey, Schunek, De Laney, Mrs. McClure's secretary, and by Friedman, he thinks, and a number of others, including railroad men—as many as 20 persons in all —the mortgage in question was regularly authorized. He testified that he was certain that more than two-thirds shares, together with 1,000 proxies, were represented and voted favorably on the proposal. On cross-examination he testified that he had refreshed his recollection by correspondence, by files at the office, and by information obtained from his secretary. But he did not bring any letters to shareholders or from shareholders or any documents in support of his recollection, since his memory, he asserted, sufficiently served him as to the action of the special meeting and its results. He was not asked to produce them.

Mrs. McClure, the secretary of the bankrupt, testified clearly and positively that a special meeting of stockholders was held late in December, 1920, for the express purpose of authorizing the mortgage, and that seasonable notice of the special meeting had been sent by her, or under her direction, to 4,000 shareholders. She recollected the approximate time of the meeting because the bankrupt opened a restaurant in the latter part of 1919, and it was the first time she recalled that a meal at the restaurant was served to the attending stockholders. She testified further that the corporate minute books in evidence contained notes of all the meetings, annual and special, including the special meeting authorizing the mortgage in question. Neither of the minute books in evidence, however, make any reference to any such meeting. The minutes of the meeting concededly are not included. Upon interrogation she asserted that she did not know when the minutes of the special meeting were taken out, and was unaware of their misplacement. She knew of just one red-covered minute book (Ex. GG), and the minute book (Ex. HH) also containing minutes of the bankrupt company, she said, was not made up by her. A letter in evidence to the witness Persch, a printer, signed by her, tends to show that she directed him to assemble certain loose sheets submitted to him and put on a cover, with instructions to deliver the same, when finished, to Mr. Heffernon, who was not called as a witness. But whatever confusion arose regarding the missing resolution finds some explanation in the testimony of Tyrell, a lawyer of Chicago, who testified that he prepared Exhibit E (the mortgage or trust deed) at claimant's request, and a resolution, to be submitted at the special meeting prior to drawing the mortgage, which related to authorization at a proposed meeting to authorize the mortgage; that the original resolution submitted to him was amended so as to refer to the collateral as a basis for extending credit of the bankrupt at the Bank of Buffalo; that he again saw a resolution after it had been passed, it having been submitted to him by claimant, but since it did not conform to his prior idea, he suggested preparing another resolution to be submitted at the annual stockholders' meeting. He was asked: "Q. And at the time you prepared exhibit E, the $150,000 mortgage, you also prepared a resolution authorizing a mortgage which was to be adopted at the special meeting of stockholders? A. I prepared—yes— there was one sent on, and I prepared another, and I remember now, I left a blank in that for Mr. Renneker, where he could set up specifically the collateral, the basis and consideration of the mortgage." It was not in the same form of the last resolution prepared by him. He was asked whether a resolution of a special meeting of stockholders was submitted to him which authorized the execution of the mortgage, and to that question he replied in substance that the resolution in terms referred to the collateral and to the action of the board of directors in directing execution of the mortgage, and that Mr. Renneker elected to take a mortgage and "they

ratified and approved the execution of that document." Renneker was not questioned regarding his possession of the resolution.

Sharp, a shareholder, deposed that he received notice to attend the special meeting in December, 1920, and that the mortgage was authorized at the meeting attended by various persons named by him; that others, whose names he did not remember, were present and that he saw proxies on the office desk.

In opposition eight stockholders were called, who testified that they received no notice of the special meeting and had never heard of the $150,000 mortgage to Renneker; while Anstey not only denied being present at the meeting, but also said he did not recollect procuring proxies from stockholders in Detroit or elsewhere for the special meeting in question, as testified by Renneker and Mrs. McClure. On cross-examination his testimony was weakened by his uncertainty. Friedman denied attending the special meeting.

Warner, of the Dunkirk Trust Company, testified to the bank making loans to the bankrupt on the faith of financial statements which made no reference to the mortgage or to Renneker's claim or indebtedness, and other testimony was received to the effect that in statements of assets and liabilities upon which they relied, no mention was made of the Renneker transaction.

It is contended on behalf of the trustee that the proofs disclose: First, that there was no meeting of stockholders at which the mortgage was legally authorized; second, that the mortgage was intentionally concealed by Renneker and De Laney from the knowledge of the stockholders and creditors; and, third, that the evidence does not show an agreement to exchange the mortgage for bonds.

But I am unconvinced of the soundness of these contentions. The evidence of meeting of the stockholders in the latter part of December, 1920, and authorization of the mortgage and approval of the prior action of the board of directors in October, though assailed as to its truthfulness, has not been successfully rebutted. Neither the fact that certain stockholders received no notice of the special meeting or did not assent to the mortgage, nor that notice of the meeting was not published as required by the statute, is sufficient to invalidate this mortgage, since the benefit of the arrangement by which Renneker put up securities and later accepted bonds continues as an obligation of the bankrupt. See cases cited on this point by the Circuit Court of Appeals. See In re Paul De-

laney, Inc., 26 F.(2d) 961. Neither the bondholder creditors nor the trustee in bankruptcy by their acceptance of bonds for their debts have any rights superior to the bonds turned over to Renneker, and the point has merit that withholding record of the mortgage, as agreed, I find, between claimant and De Laney, for the sole purpose of negotiating a large issue of bonds secured by a first mortgage to the Marine Trust Company, was in reality a benefit to the bondholders generally who were to receive bonds for money and property advanced to the corporation. I do not find from the evidence that failure to record the mortgage was with the intention of hindering, delaying, or defrauding creditors. On the contrary, its purpose was simply in contemplation of a bond issue, and not to defraud creditors; and recording, it was believed, would deter the issue. The trustee in bankruptcy is not in the position of a subsequent purchaser in good faith and for value, and record was not essential as to creditors. In re Mosher (D. C.) 224 F. 739, and cases cited.

The contention that there never was an agreement for the delivery of $150,000 of bonds to Renneker as collateral, but that instead it was to be turned over to him for the purpose of sale, is not substantiated. The resolution of the board of directors of May 25, 1921 (Exhibit 4), expressly provides that in consideration of securing a note of $100,000 to claimant, the bonds be delivered to him in the sum of $150,000, to secure said note; and to "loan or in any way invest said bonds as may be necessary in order to liquidate any such indebtedness as he may incur in securing the Bank of Buffalo to release the guarantee he has made to secure said loan or extension of credit and the collateral he has deposited with them for that purpose." The intendment of the resolution, I think, was that Renneker was given the right to dispose of the bonds at not less than $80, to satisfy the indebtedness of the corporation to him, and account for the surplus. However that may be, Renneker testified that his understanding with De Laney was that he was to obtain bonds amounting to $150,000 from the Bank of Buffalo in lieu of the collateral which, it may be assumed, included his securities on deposit with the Bank of Buffalo, and his personal guarantee as well as the mortgage that had previously been given him. He also testified that when the trust mortgage was recorded, his prior mortgage not being on record, he considered that he had lost the mortgage as security. He further testified that the bonds, pursuant to his

arrangement with De Laney, were in place of the mortgage.

Other objections argued have been examined by me, but I need not particularize them, since I have reached the conclusion that the mortgage lien to Renneker was legally authorized, and the later substitution of bonds operated as a cancellation. There are, it is true, suspicious circumstances presented, here and there, due largely to the failure to produce the minutes of the special meeting, or to sufficiently explain their loss, and as to a few of other transactions with the Bank of Buffalo consisting, in the main, of lack of candor by the president of the bankrupt who was not called as a witness. Renneker, though a director and officer of the bankrupt, was not shown to have had such connection with these matters as to justify a determination that his testimony and the testimony of Mrs. McClure was willfully false, or that there was fraudulent concealment on his part to bar recovery.

The claimant may have a decree reciting that the mortgage or trust deed was legally authorized as required by the statute of this state, and was subsequently canceled under an agreement to substitute corporate bonds therefor, held by the Bank of Buffalo, and that such bonds of the face value of $130,000, are valid and allowed as a proportional lien on the fund in the custody of the trustee in bankruptcy.